UNITED STATES of America, Plaintiff,

v.

CIBA GEIGY CORPORATION,
Defendant.

Civ. A. No. 791–69.

United States District Court,
D. New Jersey.

April 14, 1976.

See also, D.C., 508 F.Supp. 1157.

Jonathan L. Goldstein, U. S. Atty., Newark, N. J., by Richard H. Stern, Robert H. Morse, Thomas A. Schulz, P. Terry Lubeck, Jefferson B. Hill, Dept. of Justice, Washington, D. C., for plaintiff.

Lowenstein, Sandler, Brochin, Kohl & Fisher by Murray J. Laulicht, Newark, N. J., for defendant; Davis, Polk & Wardwell by Richard E. Nolan, Alfred E. Schretter, Lowell Gordon Harriss, New York City, of counsel.

## OPINION

MEANOR, District Judge.*

### FINDINGS OF FACT

### JURISDICTION

This is an action instituted on July 9, 1969 by the United States of America under

---

* I originally determined not to publish this antitrust opinion and its companion patent opinion that resulted from the antitrust rulings because appellate review might have caused these opinions to be superseded by an opinion of the Third Circuit. However, pending appeal and cross-appeal, a remand was secured upon a joint application to permit this court to pass on a proposed consent final judgment in settlement of this litigation. The consent judgment

Section 4 of the *Sherman Act*, 26 Stat. 209 (15 U.S.C. § 4) for injunctive and other appropriate relief to remedy and prevent alleged violations of Section 1 of that *Act*, 26 Stat. 209 (15 U.S.C. § 1). The court has jurisdiction of the subject matter and the parties.

## DEFENDANT

CIBA–GEIGY Corporation, a New York corporation has its principal offices in Ardsley, New York, and the principal offices of its pharmaceutical subsidiary in Summit, New Jersey. It was formed in 1970 through the acquisition of CIBA Corporation, a Delaware corporation, by Geigy Pharmaceuticals Corporation ("Geigy"), a New York corporation, following which the name was changed to CIBA–GEIGY Corporation.

At all times relevant to this proceeding, CIBA was a research-oriented manufacturer and seller of ethical pharmaceutical drugs, principally in specialty form under its own trademarks.

In 1967, CIBA's total sales were approximately $125 million, and CIBA's total assets in that year were about $137 million. In 1970, CIBA–GEIGY Corporation was the eighth largest ethical drug firm in the United States.

## CIBA'S LICENSEES AND VENDEES

### MERCK & CO. INC.

At the time of the complaint, Merck & Co. Inc. ("Merck") was a New Jersey corporation and had its general office in Rahway, New Jersey. In 1969 Merck had total assets exceeding $550 million and sales of $447 million. In 1970 Merck was the fourth largest ethical drug firm in the United States.

### ABBOTT LABORATORIES

At the time of the complaint, Abbott Laboratories ("Abbott") was an Illinois corporation and had its general office in North Chicago, Illinois. In 1969 Abbott had total assets of $388 million and sales of $404 million. In 1970 Abbott was the sixth largest ethical drug firm in the United States.

### WARNER–LAMBERT PHARMACEUTICAL CO.

At the time of the complaint, Warner-Lambert Pharmaceutical Co. ("Warner") was a Delaware corporation and had its general office in Morris Plains, New Jersey. In 1969 Warner had total assets of $572 million and sales of $808 million. In 1970 Warner was the 19th largest ethical drug firm in the United States.

### G. D. SEARLE & CO.

At the time of the complaint, G. D. Searle & Co. ("Searle") was a Delaware corporation and had its general office in Skokie, Illinois. In 1969 Searle had total assets of $173 million and sales of $164 million. In 1970 Searle was the 16th largest ethical drug firm in the United States.

### SMITH KLINE & FRENCH LABORATORIES

At the time of the complaint, Smith Kline & French Laboratories ("SKF") was a Pennsylvania corporation and had its general office in Philadelphia, Pennsylvania. In 1969 SKF had total assets of $242 million and sales of $315 million. In 1970 SKF was the seventh largest ethical drug firm in the United States.

### RICHARDSON–MERRELL, INC.

At the time of the complaint, Richardson-Merrell, Inc. ("RMI") was a Delaware corporation and had its general office in New York, New York. In 1969 RMI had total assets of $331 million and sales of $381 million. In 1970 RMI was the 21st largest ethical drug firm in the United States.

### McNEIL LABORATORIES, INC.

At the time of the complaint, McNeil Laboratories Inc. ("McNeil") was a Pennsylvania corporation and a wholly owned subsidiary of Johnson & Johnson, which was a New Jersey corporation with its general office in New Brunswick, New Jersey. In

has been approved and filed. A copy is appended to the patent opinion. Since there will be no appellate review and since I believe these opinions may be of value to future researchers, I have authorized their publication at this time.

1969 Johnson & Johnson had total assets of $482 million and sales of $664 million. In 1970 Johnson & Johnson was the 15th largest ethical drug firm in the United States.

## CARTER PRODUCTS, INC.

Carter Products, Inc. ("Carter"), originally a Maryland corporation, adopted the title Carter-Wallace Inc. on July 20, 1965 and was incorporated in Delaware by merger into a company of the same name on November 29, 1968. At the time of the complaint, Carter-Wallace Inc. had its general office in New York, New York. In 1969 Carter had total assets of $93 million and total sales of $125 million.

## LEMMON PHARMACAL CO.

At the time of the complaint, Lemmon Pharmacal Co. ("Lemmon") was a Pennsylvania corporation and had its general office in Sellersville, Pennsylvania. In 1969 Lemmon had total assets of $2.9 million and sales of $3.3 million.

## HOFFMAN–LA ROCHE, INC.

At the time of the complaint, Hoffman-LaRoche Inc. ("Roche") was a New Jersey corporation and had its general office in Nutley, New Jersey. In 1969 Roche had total assets of $260 million and sales of $290 million. In 1970 Roche was the second largest ethical drug firm in the United States.

## ELI LILLY AND COMPANY

At the time of the complaint, Eli Lilly and Company ("Lilly") was an Indiana corporation and had its general office in Indianapolis, Indiana. In 1969 Lilly had total assets of $538 million and sales of $537 million. In 1970 Lilly was the largest ethical drug firm in the United States.

## GENERAL DEFINITIONS

1. "Package form," "specialty form," and "dosage form" each mean pills, tablets, capsules, solutions, syrups, and other forms of pharmaceutical products packaged for use by or administration to humans or animals.

2. "Ethical Drug" means a drug sold on the prescription of a physician.

3. "Bulk form" means the form in which pharmaceutical products are manufactured prior to their being packaged into dosage form.

4. "Therapeutically active product" and "therapeutically active ingredient" each mean any chemical product possessing pharmacological or therapeutic utility in the treatment of humans or animals.

5. "Combination product" means any pharmaceutical product containing more than one therapeutically active product.

6. "Straight formulation" means a dosage form product containing only one therapeutically active product. Hydrochlorothiazide in straight formulation is a tablet or other dosage form that contains hydrochlorothiazide as the only therapeutically active ingredient.

7. "Combination Form" or "Fixed Combination" mean a specialty form or dosage form drug containing two or more therapeutically active ingredients.

8. "Free Combination" means the concurrent use of two or more specialty form or dosage form drugs, each of which contains one or more therapeutically active ingredients.

9. "As such" refers to any chemical product in straight formulation.

10. "Hydrochlorothiazide products" mean, collectively, bulk form and dosage form products containing hydrochlorothiazide in straight formulation or in combination with another or other therapeutically active ingredients.

11. "New Drug Application" ("NDA") means that application required to be filed with and approved by the *Food and Drug Administration* ("*FDA*") by 21 U.S.C. § 355 and 21 C.F.R. § 314 before a "new drug" (as defined in 21 C.F.R. § 310) may be sold in interstate commerce.

12. "Anti-bulk sale restriction" means a restriction on or limitation against the resale of hydrochlorothiazide in bulk chemical form.

13. "Anti-straight formulation restriction" means a restriction on or limitation

against the resale of hydrochlorothiazide in straight formulation.

14. "Approved-combination-only restriction" means a restriction on or limitation against the resale of hydrochlorothiazide other than as a combination product that has been previously approved (in this case, by CIBA).

15. "Edema" means the condition of an excess of water in the body which occurs when the body does not eliminate a sufficient quantity through the kidneys, thereby resulting in a back pressure through the veins pushing water and fluid through the capillaries out into the tissues causing such conditions as congestive heart failure, chronic lung disease, chronic cirrhosis and kidney failure.

16. "Diuresis" is the washing of salt and water out of the body by urinary excretion.

17. "Diuretic" means a chemical substance which produces diuresis.

18. "Hypertension" means an elevation of the blood pressure within the arterial system of the body which is in excess of the generally accepted level of 140 cystolic or pumping pressure and 90 diastolic or resting pressure. There are different degrees of hypertension generally referred to as mild, moderate, moderate to severe, and severe, depending upon the extent of the elevation of the blood pressure. It is generally believed in the medical profession that, as has been demonstrated by short-term and long-term studies, such elevation of the blood pressure is directly contributory to the early onset of strokes, heart attacks, kidney failure, etc.

19. "Antihypertensive" means a chemical substance which reduces blood pressure and is used for the treatment of hypertension.

20. "Saluretic" means a pharmaceutical product which causes increased excretion of salt in the urine.

## TECHNICAL DEFINITIONS

21. "Benzothiadiazine" means any derivative of a 3,4-dihydro-2-H-(1,2,4)-benzothiadiazine-1,1-dioxide.

22. "Cyclothiazide" means, and is the generic name for, the benzothiadiazine with the chemical name 6-chloro-3,4-dihydro-3-(5-nor-boren-2-yl)-7-sulfamoyl-1,2,4,-benzothiadiazine-1,1-dioxide.

23. "Hydrochlorothiazide" (hereinafter referred to as HCT) is the generic name for one benzothiadiazine derivative covered by United States Letters Patent 3,163,645, which issued to CIBA on December 29, 1964 and which will expire on December 29, 1981.

24. "Chlorothiazide" means, and is the generic name for, the benzothiadiazine with the chemical name 6-chloro-2-H-1,2,4,-benzothiadiazine-7-sulfonamide 1,1-dioxide.

## TECHNICAL BACKGROUND

Benzothiadiazines are one group of drugs which are used as diuretics, saluretics, and antihypertensives. In such therapy they are administered orally either alone or in conjunction with other drugs. The therapeutic effectiveness of the benzothiadiazines can be increased by administering them together with one or more other drugs. One widely used benzothiadiazine is HCT.

A commonly employed drug treatment for hypertension is the use of HCT plus reserpine, an antihypertensive and calming agent. The ratio of the HCT to the reserpine that produces the maximum therapeutic effect varies from patient to patient. The various combination products of this type, however, are marketed in the form of a fixed ratio of the two therapeutically active ingredients.

Hypertension is also treated by the use of combinations of HCT and other drugs, such as deserpidine, syrosingopine, butabarbital, meprobamate, methyldopa, guanethedine sulfate, and hydralazine-hydrochloride. As in the case of reserpine, for any given patient there exists an optimum ratio of the benzothiadiazine to the other therapeutically active product or products. Nevertheless, the various combination products containing HCT and one or more of these therapeutically active ingredients are marketed in a form which contains a fixed ratio of the ingredients.

Another benzothiadiazine which is used as a diuretic and antihypertensive agent is cyclothiazide. Cyclothiazide is marketed by Lilly in dosage form, in straight formulation and in combination with reserpine and other products for use as a diuretic and antihypertensive agent.

## COMMERCE RELATING TO HYDROCHLOROTHIAZIDE

At least until the filing of this complaint in 1969, HCT was sold in the United States in dosage form, as such, by only three companies: by CIBA as "Esidrix," by Abbott as "Oretic," and by Merck as "Hydro-DIUR-IL."

In 1969, CIBA, Merck and Abbott accounted for over $22 million in sales of HCT in dosage form, as such.

HCT has also been sold in dosage form in combination with other drugs by the companies and under the trade names listed below:

| COMPANY | TRADE NAME | OTHER DRUGS |
|---|---|---|
| Abbott | Oreticyl | deserpidine |
| Carter | Caplaril | mebutamate |
| | Miluretic | meprobamate |
| CIBA | Apresoline-Esidrix | hydralazine-HCl |
| | Esidrix-K | potassium chloride |
| | Esimil | guanethedine sulfate |
| | Ser-Ap-Es | reserpine and hydralazine-HCl |
| | Serpasil-Esidrix | reserpine |
| | Singoserp-Esideix | syrosingopine |
| McNeil | Butiserpazide | reserpine and butabarbital |
| | Butizide | butabarbital |
| Merck | Aldoril | methyldopa |
| | Cyclex | meprobamate |
| | Hydropres | reserpine |
| Searle | Aldactazide | spironolactone |
| Smith, Kline & French | Dyazide | triamterene |
| Warner | Perithiazide | pentaerythritol tetranitrate |

In 1969, the above companies accounted for approximately $64 million in sales of HCT combination products.

For the years 1965 through 1969, CIBA and its licensees and vendees accounted for approximately $150 million in sales of HCT products (as such and combination products) in the United States.

## CIBA'S POLICIES RELATING TO THE LICENSING AND BULK SALE OF HCT

Prior to CIBA's discovery of HCT in 1958, the general practice of CIBA was not to license other companies to practice patents received by CIBA on new pharmaceutical drugs, or to sell such drugs in bulk form to such companies. CIBA's policy was to practice the patent itself by sales in specialty form.

The reasons for this general policy were based on CIBA's own commercial interests. If CIBA licensed others, even at a substantial royalty, to make the same product CIBA was already marketing, CIBA believed that it would not be able to make enough royalty income to offset the loss of income from the possible decline of its own specialty sales. Similarly, with respect to bulk sales, CIBA believed that its profits from such sales would be insufficient to offset the possible decline of its own specialty sales. In addition, CIBA considered that both the medical profession (which had to learn about and prescribe new medicines) and the pharmacists (which had to stock and dispense them), disliked identical pharmaceutical products marketed under different brand names, the so-called "me-too" products. CIBA's general practice was therefore not to license its new patented discoveries or to sell in bulk to other pharmaceutical companies absent unusual circumstances.

On occasion unusual circumstances have caused CIBA to depart from this general policy of reserving for itself the right to practice its new patented pharmaceutical drugs. In the hormone field, where several companies, including CIBA, held various patents, it would have been impossible to produce cortisone products unless the patentees cross-licensed each other. Therefore, CIBA licensed other companies under its patent. In the case of reserpine, an entirely different situation existed. CIBA's patent on reserpine covered the alkaloid, but not the whole rauwolfia root which contained the same alkaloid in an unisolated form. Squibb was marketing, and any oth-

er pharmaceutical company could market, a product containing the unpatentable whole root despite CIBA's patent on the alkaloid. CIBA decided to license its reserpine patent at a 6% royalty in order to obtain some financial reward which it would not have received if companies chose to market a whole rauwolfia root product instead of reserpine. A third exception to CIBA's general practice was related to the discovery of an antibiotic which had limited use in the treatment of tuberculosis. CIBA did not have the facilities to produce this antibiotic, and was able to have another company make the antibiotic for CIBA only in return for a license. These situations are the only ones during the decade prior to 1958 in which CIBA licensed other pharmaceutical companies under its patents covering new pharmaceutical drugs.

## THE DEVELOPMENT OF HCT

Prior to 1957, Merck, CIBA and other pharmaceutical companies were engaged in extensive research work to develop an effective oral diuretic. At this time, the most prevalent treatment for edema or hypertension was the injection of organic salts of mercury. Understandably, this was not an acceptable form of treatment for people suffering from long-term, asymptomatic hypertension. Patients would not submit to the frequent injection of these salts to treat a disease that caused them no present discomfort. Merck was the first to succeed in discovering such an oral diuretic, when in 1956 it isolated and later patented chlorothiazide. Merck marketed this drug in 1957 under the trade name "Diuril," after obtaining the necessary *FDA* approval.

Merck for many years had been a major manufacturer of pharmaceutical products and maintained a very large research organization. Prior to its merger in 1953 with Sharpe & Dohme, Inc., however, Merck did not have a good specialty form marketing organization. Sharpe & Dohme, Inc. did not have Merck's manufacturing and research capability, but did have a very effective marketing organization. The object of the merger of these two companies was to form one company exceptionally well able to develop, manufacture and market its own specialty form products.

Being the first company to market an oral diuretic, Merck developed a reputation with physicians as the leader in the oral diuretic field. The resultant sales of chlorothiazide were quite substantial. Merck never licensed any other drug company to manufacture, vend or use chlorothiazide, nor did it ever sell this chemical in bulk.

Following the marketing of chlorothiazide, Merck continued its research in the field, for it was aware that there might be other drugs, related to chlorothiazide but not covered by the Merck patent, which would prove more effective than chlorothiazide and displace that product from the market. Merck felt that it had blazed the trail in this oral diuretic market and that it would be a terrible blow to it if some other company were able to patent a superior compound and exclude Merck from the market.

Other companies, including CIBA and Abbott, continued their independent research for an improvement on chlorothiazide. CIBA was the first to discover hydrochlorothiazide (HCT) and filed for a patent on September 29, 1958. HCT is approximately ten times as potent per dosage unit as chlorothiazide. As the proofs later showed, Merck had discovered HCT shortly after CIBA, but had filed first for the patent, on September 26, 1958. Both companies had learned from clinicians doing field work that the other company was testing the same compound, although neither company knew the other's discovery date.

With the prospect of an interference being declared by the Patent Office in mind, CIBA and Merck individually decided to approach the other for a settlement agreement. Mr. Connor of Merck testified that he and his associates decided to approach CIBA with a proposal for a royalty-free, unrestricted cross-licensing agreement. Merck felt in a strong position to bargain for an unrestricted license because it had issued to it product patents covering at least one intermediate in the production of HCT.

Like Merck, CIBA had spent a great deal of money in the development and testing of HCT. CIBA was planning to spend several million dollars during the first few months of its marketing of HCT (under the trade name Esidrix) in order to convince the medical profession to switch to Esidrix from Merck's Diuril. And, while the people at CIBA may have felt that CIBA would be awarded the priority eventually, they knew, as well, that it would be a gamble to go ahead and market Esidrix without first settling the interference with Merck. Mr. Haines, the President of CIBA, also testified that CIBA was unable to manufacture HCT without infringing Merck's patents on one or more of the intermediates. CIBA had previously approached Merck for a license for chlorothiazide itself and had been refused, so there was little to suggest that, outside the context of a settlement agreement, Merck would wish to license CIBA for the production of these intermediates.

For all of these reasons, Mr. Haines and his associates decided to approach Merck with a proposal for a settlement. It happened that Mr. Connor had a previously arranged appointment to visit Mr. Haines at Haines' New York office on December 12, 1958. Mr. Haines was to broach the subject to Mr. Connor at this meeting.

The question of asking for a royalty payment on the HCT patent was discussed at CIBA, but being uncertain as to which party would eventually get the patent and faced with the prospect that Merck would respond by asking for a royalty on the license of its intermediates, CIBA management decided not to ask for a royalty.

Haines and Connor met alone on December 12, 1958 for the purpose of discussing a subject unrelated to HCT. Following this discussion, one or the other of these men raised the issue of the pending HCT patent interference. They agreed that both companies would present to the other all the evidence available on the issue of priority of invention. The two companies would then determine which of them had priority, as between themselves. They also agreed that

the company with priority would grant to the other a non-exclusive, non-transferable license under any patent issued as a result of the applications in question to make, use and sell the patented invention free from any royalty payments. Finally, Merck agreed to grant CIBA a similar license to make and use the intermediates covered by its patents.

The government attempted to establish at trial that there was an oral agreement between Haines and Connor that Merck would not sell HCT in bulk in competition with CIBA. Evidence to support the existence of such an agreement can be found in some of the correspondence between CIBA and its parent company in Basle, Switzerland, CIBA, Ltd. A Mr. Von Werdt, an attorney in Basle, suggested that the agreement with Merck be drawn to exclude the possibility of bulk sales and bear a royalty. Haines, having previously agreed upon other terms with Mr. Connor, rejected such a suggestion. In another letter, Mr. Lucien Sichel, Haines' assistant, suggested that Haines and Connor had come to an unwritten understanding regarding the exclusion of bulk sales. Mr. Haines and Mr. Connor both denied this under oath, and Mr. Sichel, who was not present at the Haines-Connor meeting cannot recall the basis for this statement. This court finds that no such agreement existed. Nor does the evidence that Merck subsequently sold bulk HCT only once warrant a different conclusion.

The agreement, arrived at in principle at the Haines-Connor meeting, was subsequently reduced to writing and executed by both companies on February 11, 1959. The cross-licenses contained no limitations on the sale of HCT.

Mr. Haines testified that CIBA believed itself to be a number of months ahead of Merck in the testing needed to obtain the approval of the *Food and Drug Administration* for the marketing of this new drug. As he said: "We thought ... that we were far ahead of them in doing the clinical and toxicity work and if all went well we'd be able to get out on the market well ahead of Merck and be able to get our brand estab-

lished." This "lead time" was crucial to CIBA's expectation of grabbing a large portion of the diuretic market away from Merck, for Merck already had a strong identification, in doctors' minds, between diuretics and itself.

The process of marketing specialty drugs is largely directed at the prescribing physician. While the doctor is not the consumer of the product, the patient-consumer is generally legally incompetent to choose between different medications. The object of a marketing compaign, then, is to convince doctors to prescribe a particular company's drug rather than one of its competitor's. This object is aided by the use of trade names, rather than generic names. Doctors ordinarily prescribe "Esidrix" or "Hydrodiuril" rather than hydrochlorothiazide as such. The druggist, when he fills a trade name prescription, is generally bound to use only that trade named product. Drug companies employ what are called "detail men" whose job it is to visit doctors in a given area to promote the prescription of that company's products. The detail man explains the uses for which the drug is intended, attempts to set it apart from any competitive medications and handles any complaints or problems the doctor encounters in using a particular drug.

This prescription oriented process makes it imperative that any drug company looking for a large share of a specialty market have a large detail force. CIBA's detail force was only a fraction of the size of Merck's. This disparity of size in CIBA's and Merck's marketing capability was one more very substantial reason why CIBA needed many months of lead time over Merck in the introduction of HCT.

CIBA introduced HCT under its trade name Esidrix in mid-February 1959. To its dismay, it learned only a few days later that Merck had also reached the market with Hydrodiuril. CIBA's hopes of gaining a large share of the HCT market were shattered. Haines testified: ". . . . Knowing Merck's very extensive sales force and

their reputation and ability, we realized at once that Merck would have far higher sales of HCT than we would ourselves. It was a frightful disappointment." As a result of Merck's early appearance, CIBA's sales of Esidrix were substantially below what was originally forecast.

### DEVELOPMENT OF CIBA'S HCT MARKETING PLAN

CIBA countered the unexpected appearance of Merck on the market by intensifying its marketing effort, accelerating the introduction of various combination products, and entering into bulk sales and licensing agreements with other drug firms. In 1959, it introduced Serpasil-Esidrix, Singoserp-Esidrix and Apresoline-Esidrix. All three of these products were indicated for the treatment of hypertension. Additionally, in 1960, CIBA brought out Ser-Ap-Es, a triple combination drug, and Esidrix-K, a combination of HCT and potassium. These, too, were indicated for hypertension, the potassium in the latter being added to compensate for a loss of potassium in the body caused by HCT. These drugs had varying degrees of success on the market, with Ser-Ap-Es being the biggest seller. By 1969, all but Esidrix-K were still being marketed.

Beginning in February 1959, CIBA entered into negotiations with Abbott for a supply agreement and a manufacturing license. Such an agreement was executed by July 1, 1959. An agreement to supply bulk HCT to Warner-Lambert was entered into on August 27, 1959. Negotiations with the G. D. Searle Co. begun in June 1959 culminated in an agreement to supply bulk HCT dated March 21, 1960. Five more sales agreements were entered into during 1961 with SKF (March 21), RMI (May 1), McNeil (July 1), Carter (September 1), and Lemmon (October 1). CIBA and Hoffman-LaRoche signed an agreement on April 28, 1965 for the sale of bulk HCT. And, finally, CIBA and Lilly entered into a license agreement, under the patent issued to CIBA in 1964, which granted Lilly the right

to manufacture, use and sell CIBA's cyclothiazide in specialty form.[1]

All of these steps were taken by CIBA in an effort to recoup some of the profits it lost on account of Merck's early appearance on the HCT market. CIBA set out to maximize its gains by licensing its HCT patent to other companies and by selling to them HCT in bulk form, but to do so in the way which had the least impact on dosage form sales under CIBA's own label. There were two mechanisms for achieving this limited impact on CIBA's own sales: (1) limiting the license to Abbott to specialty vending only, and (2) selling bulk only when CIBA believed that the vendee's use of HCT could not directly compete with its own HCT products.

The overall CIBA marketing policy was described in a December 1961 memorandum (the "Sichel policy memo") from Sichel to the CIBA Management Committee:

> This company's policy, developed over the past three years, has been to supplement sales of the finished packaged forms by selling in bulk or granting licenses on specific products where, in the opinion of the Marketing Committee, such sales or licensing did not adversely affect sales of the same product in specialty form.

In this same memorandum, Sichel also stated that, in regard to HCT, CIBA's policy of preventing competition had been implemented by the various marketing and licensing arrangements discussed above:

> In the case of HCT, when it became apparent that we [CIBA] could not meet our original estimates [in the sale of Esidrix] because of the unforeseen early introduction of Merck's HydroDiuril, we [CIBA] first sold in bulk and licensed Abbott on April 22, 1959, to sell HCT *as such*. We have since then made seven additional agreements, all of them *limited to the sale of HCT in combination form.* (Emphasis supplied.)

In this memorandum, Sichel disclosed that CIBA had broadly announced its policy in regard to bulk sales of HCT. In response to requests from other drug companies for a supply of HCT, CIBA routinely mailed out the following form letter:

> We have never offered this product for sale in bulk as such, but have in a few instances made special arrangements where a pharmaceutical house conducting original pharmaceutical research wishes to combine Hydrochlorothiazide with a specialty developed by it, and when the combination has in our opinion valuable therapeutic qualities. In these limited situations the purchaser usually agrees to make a substantial payment to us for the use of our effective New Drug Application (which represents a very large investment by us); and agrees to purchase minimum quantities of Hydrochlorothiazide from us over a two to three year period following the introduction of the combination.

Attachment A to the Sichel policy memo, entitled "Terms of Hydrochlorothiazide Contracts," graphically illustrates CIBA's implementation and policing of its HCT policy. This chart shows that in 1961 CIBA compared the HCT combination products which it approved with those marketed by its vendees. Thus, CIBA kept itself apprised that its vendees were complying with the terms of their HCT agreements.

On June 11, 1965, CIBA updated the chart that was attachment A to the Sichel policy memo. The updated chart shows

---

1. The following is a list of patents which cover either components of HCT products manufactured by CIBA and its vendees or cover those combination products themselves.

| Product Covered | Patent Holder | Patent No. | Expiration Date |
|---|---|---|---|
| Spironolactone | Searle | 3,013,012 | December 12, 1978 |
| Triamterene | SKF | 3,081,230 | March 12, 1980 |
| HCT, Reserpine and Triamterene | SKF | 3,449,496 | June 10, 1986 |
| Mebutamate | Carter | 2,878,280 | March 14, 1976 |
| Hydralazine | CIBA | 2,484,029 | October 11, 1966 |
| Ser-Ap-Es | CIBA | 3,499,082 | November 29, 1983 |
| Guanethidine Sulfate | CIBA | 2,928,829 | March 15, 1977 |
| Serpasil-Esidrix | CIBA | 3,379,612 | November 29, 1983 |
| Apresoline-Esidrix | CIBA | 3,515,786 | November 29, 1983 |
| Syrosingopine | CIBA | 2,813,871 | November 19, 1974 |

that CIBA continued to compare the HCT combination products that it approved with those marketed by its vendees, and, thus, kept itself informed that its vendees were still complying with the terms of their agreements.

When (and ever since) CIBA implemented its HCT policy, it had available to it drug industry publications (such as F.D.C. Reports, the "Pink Sheets") from which CIBA kept itself up-to-date on the HCT products sold by its licensees and vendees.

On February 22, 1967, Andrew J. Smith (then head of CIBA's bulk chemical sales) informed Charles T. Silloway (then president of CIBA) that:

Hydrochlorothiazide is sold under a licensing agreement only. To qualify the licensee agrees to purchase 1000 Kgs. [of] Hydrochlorothiazide within a three year period following introduction of their new product. The material can be used *only* in a CIBA approved combination— usually with one of the applicant's own specialty products.

Although the agreements to which Smith referred in his memorandum to Silloway, and to which Sichel referred in his memorandum to the Management Committee, were in the form of supply agreements or requirement contracts (often with optional manufacturing licenses), that is not all that they were. The intent of CIBA throughout was to control the identity of the HCT combination products the vendee could make and sell. The reason that CIBA specified and limited a vendee's product was not purely, or even primarily, to limit CIBA's HCT supply obligations (or the vendee's requirement entitlements) under the agreement to such quantities as would be commensurate with CIBA's production capabilities. Other means were readily available to accomplish that purpose. Rather, as the evidence of the negotiations and implementations of the agreements demonstrates, CIBA's intent was to limit the vendees' use of the purchased HCT to the combination of that chemical with one or more other *specified* drugs.

## MERCK'S EXCHANGE ONLY POLICY

Following Merck's introduction of chlorothiazide in 1956, it never licensed any other company to manufacture this drug nor did it ever sell bulk to anyone. It had the entire chlorothiazide market to itself, and chlorothiazide was the drug of choice for the treatment of hypertension and edema. Merck followed a similar marketing policy with regard to HCT. The only exception to Merck's no sale policy was where Merck was able to obtain rights to or a supply of an otherwise unavailable product from the vendee company. In other words, Merck was willing to sell HCT only when it was able to receive in return a drug that it wanted and could not otherwise obtain. This was Merck's "exchange only policy."

The government would have it that this policy was a mask for an unwritten agreement between Merck and CIBA that Merck would refrain from selling bulk. The evidence does not support such a conclusion. Merck had the leading position in the diuretic field. Whether it would or would not have made economic sense for Merck to compete with CIBA for CIBA's bulk vendees is at best a debatable point. Certainly, Merck could have made, as this court believes it did, a reasonable independent business judgment not to supply other drug companies with bulk HCT, except in the limited "exchange" situation outlined above.

Merck unilaterally refused requests for HCT from 26 companies. In the case of seven other companies, it offered to consider selling bulk HCT in exchange for the rights to another compound, but in six such instances the exchange never materialized. Only in the instance of Carter's request for a supply of HCT did Merck agree to sell, and then only in exchange for a supply of Carter's meprobamate.

Even though this court is satisfied, from the testimony of the Merck officials, that Merck's "exchange only" policy was the result of a unilateral decision by Merck, the existence of this policy was of material aid to CIBA in maintaining its own policy of controlling the bulk HCT market. CIBA,

Merck and Abbott were the only companies in the United States with the right to manufacture HCT. By the terms of its license agreement with CIBA, Abbott was limited from vending HCT it manufactured in non-specialty form, as a result of which Abbott could not compete with CIBA for bulk sales. Similarly, by imposing on itself this "exchange only" policy, Merck left the bulk sales market entirely to CIBA. So, vis-a-vis a company seeking a supply of bulk HCT, CIBA was an absolute monopolist.

## THE ABBOTT LICENSE

When, faced with the early appearance of Merck in the market, it was compelled to reassess its position, CIBA came to the realization that it could use the detail capacity of another pharmaceutical house to increase the overall sales of HCT. Sometime in January 1959, Mr. George Cain, the president of Abbott, approached Sichel at a meeting in New York. Cain indicated that Abbott wanted a license to manufacture or a supply agreement for HCT. Abbott had a detailing capacity roughly equal to that of Merck and although CIBA turned Abbott down at the first request, the idea of having Abbott selling CIBA-supplied HCT became more attractive after the early appearance of Merck on the market.

On February 18, 1959, Cain spoke to Connor to request a license from Merck. Connor turned him down, but told him of the proposed settlement agreement with CIBA and suggested that he contact CIBA.

Paul Gerden, who was then the general counsel of Abbott, called Sichel shortly after Cain had spoken to Connor. For a period of several months following this initial contact, CIBA and Abbott conducted negotiations over the proposed license and supply agreement.

There was a suggestion at the beginning of the negotiations that Abbott limit itself to combination products only. Sichel reported that Gerden told him that Abbott was only interested in combination products because "of the lead time which CIBA, and Merck, too, will have on Abbott." On March 31, Sichel discussed, in a memo to Haines, a meeting of Sichel, Haines and a Dr. Wettstein, at which they had agreed to supply bulk HCT and to grant a license to Abbott for the manufacture of HCT "if possible limited to combination products." Subsequently, on April 3, Cain indicated in a letter to Sichel that Abbott was not interested in a license limited to combination-form-only products.

CIBA did, however, insist at some point that the license agreement exclude the possibility of bulk sales of HCT by Abbott. Haines testified that he told Cain that "some of my colleagues aren't happy that I didn't in my previous discussion with you tell you that we wanted to limit your license to sales in package form." Haines also testified that Cain made no objection to such a restriction. Haines identified these "colleagues" as the marketing people at CIBA.

The supply and license agreement, limited to exclude the sale of HCT in bulk, was dated April 22, 1959, but was not fully executed until July 1, 1959.

The agreement was in three parts. The first dealt with the sale to Abbott, for a payment of $100,000, of the right to use CIBA's effective NDA on HCT in preparing and filing its own NDA with the *Food and Drug Administration*. The agreement also provided for the sale of 2,000 kilos of bulk HCT to Abbott at $250 per kilo, with an option to buy 5,000 more at the same price. Abbott felt that it needed this amount of HCT to get onto the market as quickly as possible, without waiting to perfect its own manufacturing processes. Finally, CIBA granted to Abbott a non-transferable, royalty bearing license to make, use and sell HCT in specialty form.

It is fair to conclude from the evidence that both CIBA and Abbott, at all times, believed that the license agreement limited Abbott to the sale of HCT in specialty form. After the signing of the license agreement many drug companies requested a supply of bulk HCT from Abbott. In each instance, Abbott refused the request. Often, Abbott did so based upon its interpretation that its

agreement with CIBA did not permit Abbott to make such sales and that any such sales would be an infringement of the CIBA patent. At least until the filing of the complaint in this case, Abbott sold HCT in specialty form and not in bulk form. On May 29, 1973, CIBA wrote to Abbott stating: "We hereby modify the [April 22, 1959 HCT license agreement] so that you are additionally licensed to make, have made, use and sell 'Hydrochlorothiazide Products' ... without limitation." Several months later, Abbott agreed to sell HCT tablets to Parke, Davis & Company. Since that time Abbott has sold, pursuant to that agreement, a large quantity of HCT tablets in "bulk" (unbottled and in units of 50,000 tablets) to Parke-Davis.

## THE CIBA–WARNER AGREEMENT

Warner is and at all times relevant to this proceeding has been a diversified pharmaceutical company engaged, inter alia, in the manufacture and sale of ethical drugs through its Warner-Chilcott Laboratories Division. Although Warner Nepera Chemical Division manufactures some bulk chemicals, Warner does not, as a matter of policy, purchase drugs for resale in bulk to other pharmaceutical companies.

Warner was the first company not involved in the patent dispute to enter into an agreement with CIBA regarding the sale of HCT. Warner became interested in obtaining HCT in the summer of 1959. It first approached Abbott for a supply, but Abbott replied that it did not sell HCT in bulk. Warner then contacted CIBA on August 18, 1959 and there followed a meeting between Haines and Sichel of CIBA and Clark and Arnow of Warner.

CIBA thought at first that it would make the same deal with Warner that it made with Abbott, i. e., an interim supply agreement together with a license to manufacture in specialty form and a sale of the effective NDA for $100,000.[2] Warner, however, felt that it was too late at that time to attempt to market a straight form of HCT in competition with CIBA, Merck and Abbott. Rather, Warner was immediately interested in marketing a combination of HCT with Peritrate, Warner's trade name for an unpatented coronary vasodilator marketed by Warner as a specialty product. Warner sought a supply agreement but also wanted it understood between the parties that it could later obtain a license from CIBA to manufacture HCT.

Sichel prepared a memorandum of this meeting for Haines. In this document he outlined the terms of the agreement reached with Warner. Warner agreed to pay $250 per kilo for 1,000 kilos of HCT, which it proposed to use in combination with Peritrate. Warner also agreed to pay $75,000 for the right to use CIBA's effective NDA covering HCT to obtain its own NDA "on a combination of hydrochlorothiazide with an active ingredient" but agreed not to use the NDA to obtain its own NDA solely on HCT. Abbott had paid $100,000 for the right to consult the CIBA NDA in support of its own NDA on straight form HCT. Lastly, CIBA and Warner had agreed that if and when Warner should want to have a license to manufacture HCT and sell it in combination form, CIBA would extend such a license. On the other hand, as Sichel informed Haines in a memo dated August 19, 1959, should Warner want a license "on the use of hydrochlorothiazide alone, the entire contract [would] have to be renegotiated in view of CIBA's commitments to Abbott."

The first draft of the agreement submitted by CIBA to Warner contained in the "Whereas" clauses the recitation that Warner wished to purchase HCT from CIBA "to be combined with other products of its own and to be marketed in package form in such combination." Warner officials deleted "of its own" and changed "combination" to

2. At the meeting, Clark was shown a copy of the Abbott license with all references to Abbott blocked out. Through inadvertence, the words "North Chicago, Illinois" were not blocked out, and Clark and Arnow correctly surmised that Abbott had a license agreement with CIBA regarding HCT. This court finds that the imparting of this information to Warner was purely accidental and was not an attempt to solicit Warner's participation in a conspiracy.

read "combinations." CIBA acquiesced in these changes.

## THE PARTIES' UNDERSTANDING OF THE AGREEMENT

At all times, CIBA understood that Warner could not resell the HCT purchased from CIBA in any form other than a specialty form combination. Thus, it was CIBA's understanding that Warner could not (1) resell the HCT in bulk to a third party, or (2) market the HCT in the form of a straight formulation specialty.

As was to be true of every vendee CIBA dealt with, Warner did not, as a matter of policy, engage in the practice of purchasing drugs in bulk for resale in bulk. Similarly, as was to be true of nearly every vendee CIBA dealt with, Warner had made an independent judgment not to market a straight formulation of HCT. Warner paid only $75,000 for the right to refer to CIBA's NDA rather than the $100,000 paid by Abbott because Warner had only the right to refer to CIBA's NDA in seeking approval of combination products and could not use CIBA's NDA in seeking approval to market HCT in straight formulation. Warner understood that CIBA was selling it the HCT only for use in combination with another active ingredient. This understanding, which was shared by CIBA, formed the basis of the sale agreement.

Warner first encountered delays in getting *FDA* approval of its NDA on the combination of HCT and Peritrate. Then, after it was marketed, the combination proved to be relatively unsuccessful. By July 1962, Warner had an excess inventory of approximately 600 kilos of HCT. CIBA's going price for HCT had by this time fallen to $85 per kilo in comparison with the $250 paid by Warner. The price of imported HCT, which was available and not infringing as no patent had issued, was only a fraction of CIBA's price. Clark approached Sichel to inquire whether CIBA would be willing to buy back. CIBA was not interested in doing so. Warner then made some failing efforts to sell to third parties, and, after some internal consideration of the huge write down it would have to take on this inventory one way or the other, Warner eventually decided to retain the inventory even if it meant taking years to use it up in the sale of the combination product. Warner never did use up all of this inventory and in 1966 was forced to destroy over 400 kilos which had spoiled because of old age.

The conclusion to be drawn from this incident is that Warner would have sold the excess of bulk HCT to a third party if it could have done so economically. The going price for HCT from non-CIBA sources was at a level somewhere around 10% of the price Warner had paid for the HCT. Therefore, it made as much sense for Warner to hold onto the excess in the hope that its sales would increase as it did to take the huge loss involved in a sale.

The final delivery of HCT by CIBA to Warner took place on March 15, 1961. Since that date, some 15 years ago, CIBA has sold no HCT to Warner. Nor did Warner ever exercise the option to take a license to manufacture HCT.

## THE CIBA–SEARLE AGREEMENT

At all times relevant to this proceeding, Searle manufactured and sold ethical pharmaceutical drugs in specialty form. Although Searle manufactured some chemicals, it did not (with one exception) sell pharmaceutical drugs in bulk form to other firms. Nor did Searle ever engage in purchasing drugs in bulk for resale to other companies.

On June 29, 1959, Daniel Searle (then assistant to the president of Searle) called Henry Gasden (then vice president of Merck) regarding the bulk purchase of HCT from Merck. In response, Gasden informed Daniel Searle that Merck was not interested in a simple bulk sale of HCT, but made some detailed proposals regarding an exchange for Searle's spironolactones.[3] Dan-

---

**3.** Spironolactone is an anti-aldosterone agent, covered by a patent issued to Searle. Searle markets it under the trade name Aldactone. Aldactone is a potassium-sparing diuretic use-

iel Searle then called Sichel at CIBA. During this conversation, Sichel informed Daniel Searle of the possibility of an arrangement between CIBA and Searle by which Searle would use HCT purchased from CIBA "solely in a combination product" with one or more of Searle's spironolactones.

Six months passed during which time Searle's interest in an HCT deal flagged. Daniel Searle and Dr. Wettstein of CIBA, Ltd., Basle, exchanged a number of communications regarding the possibility of a mutual exchange of products, much as Merck contemplated. Searle was seeking an agreement where it could have the sole rights to market the combination in the United States, Canada and England. Such a deal never materialized.

On November 20, 1959, Sichel and Haines met with Daniel Searle in Summit, N. J. Daniel Searle indicated his company's willingness to enter into a contract to purchase all of its requirements of HCT for the next three to five years from CIBA. Daniel Searle indicated that the combination product containing HCT and Aldactone would reach the market in the spring of 1960. Daniel Searle also said that his company was not interested, at that time, in introducing HCT in straight formulation.

Finally, on March 21, 1960, CIBA and Searle entered into an agreement by the terms of which Searle agreed to purchase and CIBA agreed to supply three years' requirements of HCT. CIBA also furnished Searle clinical data relating to chronic toxicity characteristics of HCT. Searle paid no additional consideration for this information but agreed to use it only in the course of placing HCT on the market in combination form.

By its terms, this agreement expired in 1963. Although it was never renewed, Searle has continued to purchase bulk HCT from CIBA on open account.

The agreement was prefaced by three recitals which related the parties' under-

standing that Searle was interested in combining the purchased HCT with one or more active ingredients. These recitals are not dissimilar from those that appear in other CIBA supply agreements. It is fair to conclude that it was CIBA's intention that Searle use the purchased HCT only in combination products. The evidence shows, however, that Searle never considered itself constrained in any way in its rights to dispose of the purchased HCT.

Searle considered that it could have combined the purchased HCT with a drug other than Aldactone, if it had so elected. Searle also considered that it could have resold the HCT in bulk form. Lastly, Searle was never interested in marketing straight form HCT.

The negotiations between CIBA and Searle were conducted solely between these two companies. Searle was not informed by CIBA of the contents of its other licensing and vending agreements, aside from the occasion on which Sichel informed Daniel Searle that there was a "most favored nation" clause in an agreement with Abbott. Daniel Searle knew none of the other details of the Abbott license.

## THE CIBA–SKF AGREEMENT

Sometime in late 1960 or early 1961, F. Markoe Ravinus (then the executive vice president of SKF) called Sichel at CIBA to inquire into the availability of HCT. Ravinus indicated to Sichel that SKF wanted to combine HCT with SKF's newly patented potassium sparing diuretic, Dyrenium (triamterene). SKF was interested in combining it with HCT because HCT was the best known and most widely prescribed diuretic on the market. Sichel informed Ravinus that HCT was available in certain circumstances and arranged for a meeting between the SKF and CIBA people which took place in Philadelphia on January 27, 1961.

---

ful in the treatment of edema and in the treatment of hypertension. Searle was interested in combining Aldactone with a sulfonomide diur-

etic such as HCT because, at the time, Searle had clinical information indicating a synergistic effect between the two.

On this date, officials of the two companies met to discuss SKF's request for HCT. Mr. Grant (then director of R & D agreements at SKF) and Dr. Edgerton (then head of SKF's patent section) were present on behalf of SKF. Sichel, Goldsmith (then head of CIBA's patent department) and Kolodny (an attorney in CIBA's patent department) were present for CIBA. Kolodny, in a memo later prepared for Sichel, recalled some of the conversation:

> The SKF representatives were told that CIBA might be receptive to the grant of a license, limited to the United States, (1) of the type granted to Abbott involving the right to make the drug or (2) of the type granted to Warner-Lambert involving supply of the medicinal, *provided the combinations involved were not those marketed by CIBA.* The SKF representatives asserted that they were certain that their combinations were not the ones in which we were interested, their primary interest being in a combination of hydrochlorothiazide with an agent on which they expected to obtain a patent in the near future. (Emphasis supplied.)

On March 2, 1961, Sichel sent SKF a draft agreement which embodied the terms CIBA and SKF had been discussing during the month of February. The agreement was a supply agreement with a stand-by license to manufacture. In the recitals, it was stated that SKF was to combine the HCT purchased from CIBA with "at least one other therapeutically active product and in such combination [market the product] in packaged form...." The stand-by license authorized SKF "to manufacture, use and sell in packaged form hydrochlorothiazide in combination with another active drug."

On April 3, 1961, SKF wrote CIBA and proposed several changes to the draft agreement. One of these changes was the insertion of the phrase, "of SKF's selection," describing the other ingredient in the allowed combination product if SKF chose to have a manufacturing license from CIBA. SKF insisted on this change because it was a "[c]larification of SK&F's right of untrammeled selection as respects the other ingredient in the combination." This change was accepted by CIBA.

## THE PARTIES' UNDERSTANDING OF THE AGREEMENT

It has always been CIBA's understanding of the CIBA–SKF HCT supply agreement that SKF was "*limited* to the sale of hydrochlorothiazide [which CIBA sold to SKF] in combination form." (Emphasis supplied.) CIBA understood that the HCT it supplied SKF "would be used only in the combination products suggested."

SKF encountered considerable delays in marketing its combination product. *FDA* approval was not received until December 1965. Consequently, it was not for a number of years after the execution of the 1961 agreement that anyone at SKF was called upon to interpret its meaning.

In February 1966, the question arose whether SKF had the right under the agreement to market an additional combination containing HCT, triamterene and reserpine. Hershey, an attorney, met with several other people at SKF to review the 1961 contract. Their opinion was that the agreement itself contemplated only one combination but that CIBA might be sensitive enough to Justice Department attitudes to back off from such an interpretation. Following this meeting, Dr. Edgerton, who had been part of the original SKF negotiating team, told Hershey that it was his distinct recollection that more than one combination product was mentioned during the negotiations with CIBA. It was Edgerton's opinion that SKF should proceed with the marketing of the second combination without seeking CIBA's acquiescence. SKF did so proceed without telling CIBA. Finally, however, SKF was unable to market this combination because of CIBA's patent on its HCT-reserpine combination.

On September 19, 1966, Sears, another attorney who reported to Hershey, wrote a memorandum regarding the possibility of SKF's marketing the HCT-triamterene combination for veterinary use. As regards

the availability for veterinary use of the HCT sold to SKF by CIBA, Sears concluded that CIBA had no right to restrict SKF's use of the HCT after its sale to SKF. It appears that SKF did, in the end, obtain CIBA's approval for the marketing of this combination.

It is fair to infer from these two incidents · that the people at SKF felt partially restricted by the terms of the agreement with CIBA. While, in each case, the final decision was to proceed as if the contract did not restrict SKF's use of the vended HCT, these decisions were only taken in the face of strong feelings that the agreement had meant to restrict such use. The SKF employees exhibited a full awareness that CIBA might retaliate for what it took to be violations of the agreement.

There is no evidence that SKF ever contemplated or desired to market HCT in straight formulation. SKF's initial interest was in finding an effective thiazide to combine with triamterene, a product that it expected to obtain a patent on in the near future. The only other interest SKF ever expressed was in a combination of triamterene, HCT and reserpine. There is also no evidence that SKF was ever interested in reselling in bulk the HCT purchased from CIBA. It is inferable that it is not the normal practice for SKF to engage in such a brokerage transaction.

SKF did understand that the optional license agreement imposed a specialty form only and a combination form only restriction on it. In 1968, SKF considered whether it should begin manufacturing HCT for its own use. Hershey and Sears came to the conclusion that: "[t]he 1961 agreement allows SK&F to sell only in packaged form. This means that we cannot sell the HCT combination in bulk." In addition, Sears interpreted this language to mean that "the license will be limited to combination products only and will not grant SK&F the right to make a product with HCT as the sole active ingredient." With an eye toward possible anti-trust problems, SKF asked CIBA to delete the packaged-form-only restriction. CIBA refused to do so.

SKF never exercised the option to take a license, so the terms of the unexecuted option never constituted a restraint on trade, if, indeed, they would have been illegal at all.

## THE CIBA–RMI AGREEMENT

At all times relevant to this proceeding RMI was a Delaware corporation with its principal place of business in New York, New York. RMI was engaged in human and veterinary ethical and proprietary pharmaceutical sales. The William S. Merrell Co. and The National Drug Company, divisions or subsidiaries of RMI, sold ethical pharmaceutical drugs for human use. Jensen-Salsbery Laboratories, Inc., a division or subsidiary of RMI, sold ethical pharmaceutical drugs for veterinary use.

In the summer of 1959, RMI requested that Merck sell bulk HCT to RMI. By December 1960, at the same time that SKF approached CIBA for HCT, RMI again attempted to obtain HCT from Merck. Merck refused to deal except on an exchange basis, and RMI decided to look elsewhere.

On February 27, 1961, after a preliminary telephone contact with Sichel, R. H. Cox (of RMI) met with Sichel and Haines. At this meeting, Cox expressed RMI's interest in HCT. In response, CIBA "offered HCT for combination use. . . ." This offer was conditioned upon the general acceptability to CIBA of the "therapeutic rationale" for such combinations and some assurance as to the "market potential."

On March 17, 1961, Sichel wrote to Frederick D. Lamb (then secretary and attorney of W. S. Merrell Division of RMI) enclosing a draft of an HCT supply agreement. Sichel's letter stated that "the total understanding between our companies" provided that RMI could sell and use the HCT which CIBA manufactured and sold to RMI "in combination with MER/29 in the United States and Canada. . . ."

On March 27, 1961, Lamb sent a copy of the proposed draft agreement to various RMI officials, including R. H. Cox, requesting their comments.

On April 4, 1961, Cox replied, telling Lamb that in his original contact with Sichel and Haines he had discussed RMI's potential interest in HCT on a multidivisional basis, and not just for combination with Merrell's product MER/29. Cox also informed Lamb that CIBA had raised no objection to RMI's multidivisional interest and had agreed that the HCT which CIBA might sell to RMI would be available to RMI's pharmaceutical divisions "for combinations." Cox, thus, recommended that the draft agreement be changed to supply HCT on an "enterprise-wide basis" and to assure RMI the right to market more than one product, subject to the "approval" of that product by CIBA as Sichel and Haines had provided at the first meeting.

On April 18, 1961, Sherwood E. Silliman (then secretary of RMI) suggested that, in addition to naming as parties to the draft agreement those RMI divisions suggested by Cox, the J. T. Baker Chemical Co., a subsidiary of RMI then engaged in the manufacture and sales of bulk chemicals, also be named as a party to the stand-by manufacturing license, attached as Appendix A to the agreement.

On April 19, 1961, Lamb sent Sichel a proposed draft agreement which incorporated the changes suggested by Cox and Silliman.

By April 25, 1961, RMI anticipated that the agreement with CIBA would include the following:

Hydrochlorothiazide will be available to our ethical pharmaceutical divisions (Merrell, National, Walker, Jen-Sal) for the U.S.A. and Canada for combinations products, where the therapeutic rationale and market potential are acceptable to CIBA.[4]

However, Cox informed the divisions of RMI (other than Merrell) that, if they were interested in using HCT they should outline their interest in detail. Cox stated:

In view of certain aspects of the proposed agreement with Ciba, we feel that expressions of R–M interest other than that already formally approved (i. e. combination with MER/29) go to Ciba [through Lamb or Cox] and only after the basic agreement is finalized.

On May 11, 1961, Sichel sent Lamb a redraft of the agreement Lamb forwarded to Sichel on April 19. Among the changes proposed by CIBA in this redraft was a deletion of the J. T. Baker Chemical Co. from the definition of "RMI" in the license agreement in Appendix A to the draft. Sichel informed Lamb the reason for this deletion was because Baker was "a bulk chemical supplier rather than a pharmaceutical manufacturer."

On June 19, 1961, Lamb sent Sichel an agreement signed by RMI officials. With the execution of this agreement, Lamb asked Sichel "to comply strictly with the terms" of the agreement and to send Lamb "Ciba's written approval" for the combination of MER/29 and HCT. On June 21, 1961, Sichel informed Lamb, in writing, that the "combination by Richardson-Merrell of hydrochlorothiazide with your product MER/29 meets the approval of CIBA as provided for in the agreement in question."

The third "whereas" clause of the CIBA–RMI agreement provided that the purchase of HCT from CIBA was "for the sole purpose of preparing and marketing a product or products which make use of a combination of HCT with another or other therapeutically active ingredients, after approval of each combination by CIBA (hereinafter called 'combination products')." (Emphasis

---

4. In relation to the supply agreements that gave CIBA the right to "approve" the vendees' proposed combinations, CIBA maintains that it only considered whether the combination had market potential and was justified in terms of its therapeutic rationale.

  The testimony of Dr. Yonkman, CIBA's top pharmacologist, fully establishes that CIBA never seriously investigated the pharmacologi-

cal properties of any combination proposed by a vendee. At most, someone in CIBA's management would ask Dr. Yonkman whether the HCT and XYZ combination "sounded like it made sense" but that was the extent of CIBA's investigation.

  Clearly, the "approved only" language was a way for CIBA to control the combinations vendees put out.

supplied.) This phrase "combination products" is then used again in the first operative paragraph of the contract. This paragraph provides that "CIBA shall produce for and sell to RMI and RMI shall accept and pay for such quantities of Hydrochlorothiazide as RMI shall require for incorporation in the '*combination products*.' " This was the first of four "approval by CIBA" agreements. The HCT purchased from CIBA was not for use in straight formulation, and could not be combined with any drug the vendee wanted, nor could it be disposed of in bulk.

### THE PARTIES' UNDERSTANDING OF THE AGREEMENT

At all times, CIBA understood that its agreement with RMI prohibited that company from reselling the HCT which CIBA sold in any form other than in a combination product which met with the explicit approval of CIBA. That is, RMI could not resell the HCT (1) in bulk form, (2) in straight formulation, and (3) in a combination not first approved by CIBA.

On June 22, 1961, CIBA's Management Committee expressed its understanding of the RMI agreement as follows:

The Committee noted that the license agreement had been executed between Richardson-Merrell and CIBA-Summit for the sale of hydrochlorothiazide for *use in combination products* with option to take a license to manufacture, use and sell hydrochlorothiazide in combination form at a royalty rate of 6%. *Approval of each combination is up to CIBA.* The first combination which we have approved is hydrochlorothiazide with MER/29. (Emphasis supplied.)

At all times RMI understood that its agreement with CIBA prohibited RMI from reselling the HCT which CIBA sold in any form other than in a combination product which met with the explicit approval of CIBA. It knew that it could not resell that HCT (1) in straight formulation, or (2) in a combination product not first approved by CIBA.

On August 11, 1961, Lamb distributed to RMI personnel a summary outline of the CIBA–RMI agreement:

All use of hydrochlorothiazide must be in combination with another or other active ingredients. All proposed combination products must first be approved by Ciba. F. D. Lamb to be enterprise contact with Ciba for approvals of combination products.

On August 28, 1961, Dr. Shelton proposed to Lamb a combination product containing HCT and the RMI estrogen, TACE. Lamb responded that such a combination "would have to be checked with Ciba just as any combination has to be."

### RMI'S UNDERSTANDING OF CIBA'S ATTITUDE TOWARD PROPOSED COMBINATIONS

RMI understood that CIBA would not allow RMI to use the HCT purchased in any combination which would duplicate one CIBA marketed or intended to market.

On May 8, 1961, Dr. R. S. Shelton (then an RMI consultant) asked Lamb whether the HCT supply agreement contemplated with CIBA contained any particular restrictions. Lamb responded as follows:

Of course, I cannot guarantee that Ciba may disapprove a combination product which is not within the following general classification, but as a general guideline we should avoid any product which is a straight diuretic compound... or the combination of hydrochlorothiazide with Reserpine.

On May 18, 1961, Dr. Shelton informed Lamb that he was glad to know that a combination of HCT with an anti-obesity agent was not within one of CIBA's "forbidden areas," because there might be interest in such a combination by one of RMI's divisions. Shelton also told Lamb that the anti-straight formulation restriction did not concern him much because he was "quite sure none of the companies are interested in marketing the material as such since that would be a highly competitive item and there are now eight or nine companies promoting thiazide diuret-

ics...." Shelton went on to say that it was interesting to know that the reserpine combinations were out, as certain of RMI's divisions had been interested in such a combination.

On July 28, 1961, Lamb told Shelton that it was his understanding that CIBA would not give approval to RMI to use the HCT, which CIBA sold, in any combination which "would be identical to, or almost similar to, a product which [Ciba] is marketing or intends to market."

## THE IMPLEMENTATION OF THE AGREEMENT

On June 30, 1961, Lamb requested CIBA's approval for RMI to use HCT in a combination product containing HCT and Tenuate, an appetite suppressant. Lamb informed Sichel that such a combination would be "an untapped market." [Lamb also stated to Sichel that RMI would not engage in any further work on this combination without CIBA's approval.] CIBA's Management Committee subsequently approved RMI's use of this combination. This approval was "pursuant to the terms of the agreement...." Sichel then informed Lamb by telephone of CIBA's approval.

By July 18, 1961, the Jensen-Salsbery Division of RMI became interested in using the HCT purchased from CIBA in a straight formulation veterinary product. Jensen-Salsbery was "among the top three companies in sales to veterinarians in the United States." Jensen-Salsbery was also one of the divisions of RMI entitled to use the HCT under the terms of the supply agreement. Lamb relayed this request for approval to Sichel who replied that there was not the "remotest chance" of such a straight formulation product being marketed. Sichel expanded by saying that CIBA had its own "plans to market hydrochlorothiazide in a single entity vet specialty product." Several top officials at CIBA and the Management Committee itself denied RMI's request. Sichel communicated this refusal to Lamb. RMI never insisted that CIBA meet its requirements for such a single entity veterinary specialty. Never-

theless, RMI's continuing interest in marketing a veterinary product containing only HCT is evidenced by the fact that, in 1965, the Jensen-Salsbery Division of RMI entered into an agreement with CIBA to market such product tableted by CIBA under CIBA's trade name, VETIDREX.

On July 26, 1961, Lamb wrote to Sichel and asked for CIBA's approval for the combination of HCT and the National Division's product, Rauvertin Improved. CIBA approved and Sichel so informed Lamb.

RMI never marketed any HCT product of its own. MER/29 was withdrawn from the market in 1962 before RMI even filed an NDA on the proposed combination of that drug with HCT. The proposed combination of HCT and the anti-obesity agent, tenuate, never was marketed, as the clinical trials were unsatisfactory. Similarly, the other combinations that RMI had approved by CIBA never reached the marketing stage.

It is true that CIBA never disapproved any proposed combination, nevertheless, it is also true that RMI was well aware of the sorts of combinations that CIBA would not allow. Lamb knew to avoid the combinations that were being marketed by CIBA and to avoid straight formulations.

Altogether RMI purchased only 51 kilos of HCT from CIBA, all for experimental and trial use. As RMI never succeeded in finding a combination that both met CIBA's requirements and was commercially attractive, it never purchased commercial quantities of HCT from CIBA.

## THE CIBA–MCNEIL AGREEMENT

At all times relevant to this proceeding, McNeil, a subsidiary of Johnson & Johnson, Inc., was a Pennsylvania corporation having its principal place of business in Philadelphia. McNeil manufactures and sells ethical pharmaceutical drugs. McNeil's policy was not to produce drugs for sale in bulk form to other pharmaceutical companies. Similarly, it did not purchase drugs in bulk for resale in bulk to other pharmaceutical companies. The marketing strategy of McNeil was to market its own specialty products under its own trade marks.

In the spring of 1961, Robert McNeil, Jr. (then president of McNeil) met with Sichel and Haines and requested that CIBA sell bulk HCT to McNeil. Sichel later discussed the request over the telephone with McNeil. Afterward, Sichel forwarded to McNeil a draft of the "type of agreement we have been using." The draft agreement was the "approved combination only" sort of agreement that CIBA had entered into with RMI.

On August 11, 1961, Robert Leininger (the vice president and secretary of McNeil) returned the executed agreement to Sichel. Leininger also asked that CIBA send McNeil a letter stating CIBA's approval for McNeil to market the combinations of (1) HCT and butabarbital,[5] and (2) HCT, butabarbital and reserpine. Sichel responded to Leininger's request stating:

> This will confirm our understanding, based on recent conversations between representatives of our firms, that combined hydrochlorothiazide with (1) butabarbital and (2) butabarbital and reserpine are combinations which meet our approval according to our agreement of July 1, 1961.

The executed agreement between CIBA and McNeil contained the same language relating to "combination products" as was found in the RMI agreement. CIBA's obligations to supply and McNeil's right to require were both defined as being identical to McNeil's requirements for the approved combinations.

## THE PARTIES' UNDERSTANDING OF THE AGREEMENT

At all times, CIBA understood that its agreement with McNeil prohibited McNeil from reselling the HCT which CIBA sold to McNeil in any form other than in a combination product for which CIBA first gave its approval. CIBA understood that McNeil was precluded from selling (1) in bulk form, (2) in straight formulation, and (3) in a combination not first approved by CIBA.

McNeil's understanding of the agreement is more problematic. The deposition testimony of Mr. McNeil and Mr. McConnell offer convincing proof that McNeil had no interest in reselling the bulk HCT to any other drug company. McNeil never combined the HCT purchased from CIBA with any active ingredients other than butizide and butaserpazide. Nor is there any evidence that McNeil ever considered any further combination products. Certainly, it never proposed any further combination to CIBA.

There is testimony that McNeil had no commercial interest in selling a straight formulation of HCT. On the other hand, there is evidence that McNeil felt that its agreement with CIBA prohibited such sales. In 1962, Eugene Dooner (then the director of hospital services for McNeil) wanted to bid (on behalf of McNeil) on a V. A. hospital specification for HCT in straight formulation. Dooner telephoned Leininger (of McNeil) and explained what he wanted to do. Leininger responded that he wanted to check the supply agreement. Leininger thereafter informed Dooner that McNeil was unable to bid on the V. A. hospital specification because of limitations incorporated in the CIBA agreement. While it is doubtful that McNeil would have gone into the straight formulation business notwithstanding the provisions of the supply agreement, this incident does indicate that McNeil felt itself limited by the restrictive provisions in the agreement.

Aside from CIBA's indication that it might have similar agreements with other unnamed companies, McNeil was not told by CIBA and did not learn from any other source the terms or provisions of any of CIBA's existing or subsequent agreements with any other licensee or vendee.

## THE CIBA–CARTER AGREEMENT

At all time relevant to this proceeding, Carter was a Maryland corporation with its principal place of business in New York, New York. Carter is engaged primarily in the manufacture and sale of ethical pharmaceutical drugs in specialty form.

---

**5.** Butabarbital is an unpatented drug sold under many labels.

Carter discovered and patented meprobamate, a tranquilizer which it marketed under the trade name Miltown. By 1959, Carter had decided to market a combination of meprobamate and HCT. Carter approached Merck to obtain HCT and Merck, consistent with its policy, agreed to sell HCT to Carter only if Carter would sell meprobamate to Merck. By written agreement dated February 12, 1960, Carter agreed to sell Merck its requirements of meprobamate and Merck agreed to sell Carter its requirements of HCT. Neither company was required, however, to purchase its requirements from the other company. The agreement had a term of two years and was renewed in 1962 and 1964. Merck marketed its combination of HCT and meprobamate under its trade name Cyclex. Carter also marketed the same combination under its trade names Miluretic and Pree-MT, but discontinued such marketing due to poor sales in 1968. Although the Merck and Carter products were chemically identical, the combinations were marketed for different and non-competing therapeutic indications: Merck's for premenstrual tension and Carter's for congestive heart failure.

Subsequently, Carter discovered another drug called mebutamate, a sedative with antihypertensive effects, which Carter eventually patented and marketed under the trade name Capla. By December 1960, prior to the issuance of a patent on the compound, Carter decided to market a combination of Capla and HCT. Carter asked Merck to furnish Carter with an additional supply of HCT for this purpose in exchange for Carter selling mebutamate to Merck. In January 1961, Merck indicated that it was not interested in mebutamate and would not supply Carter's HCT requirements for such a combination. It is apparent that neither Merck nor Carter believed that the existing supply agreement gave Carter the right to order HCT from Merck for inclusion in any combination other than with meprobamate.

Carter then approached CIBA to obtain a supply of HCT, describing the proposed product to be combined with HCT only as W–583. Sichel sent Carter a draft supply agreement, which did not contain an option to take a license to manufacture. Carter requested such an option, and CIBA sent a new draft with an option to take a license.

This draft contained the typical CIBA supply agreement recitals that Carter was interested in marketing a product containing a combination of HCT and W–583 in packaged form. The contract then went on to express Carter's agreement to purchase its requirements of HCT from CIBA for a period of two years following the filing of an NDA on the combination. After reviewing the draft, Carter's attorney recommended that the language of this obligation to purchase requirements explicitly state what was already CIBA's intention, that such an obligation ran only to Carter's requirements for the combination of HCT and W–583. Carter already had a contract with Merck to obtain its HCT supplies for combination with meprobamate, and so would not be buying all of its requirements for HCT from CIBA. None of Carter's proposed changes altered the basic understanding which Sichel expressed in his letter of March 17, 1961 transmitting the draft to Carter:

> Our entire understanding at the present time is for an agreement which authorizes Carter to use our hydrochlorothiazide in combination form with W–583 in the United States.

On September 19, 1961, CIBA's Management Committee approved the "proposal to sell hydrochlorothiazide to Carter Products for sale in a combination product with Carter's W–583."

## THE PARTIES' UNDERSTANDING OF THE AGREEMENT

It has always been CIBA's understanding of the CIBA-Carter supply agreement that the HCT which it sold to Carter was for use only in combination with Carter's product mebutamate (W–583). CIBA understood that its agreement with Carter, like the others, was for combination only.

It has always been Carter's understanding of the agreement that the HCT

purchased by it from CIBA was for use only in combination with its product W–583. By the terms of the contract, Carter was to pay CIBA $85 per kilo (2.2 lbs.); whereas, Carter was paying Merck $84 per lb. Certainly, it would have been to Carter's interest to use the HCT purchased from CIBA in its combination with meprobamate and to allow the agreement with Merck to expire. Rather, Carter renewed the Merck agreement several times.

Even when it was faced with an excess of HCT for combination with mebutamate and an outstanding obligation to purchase still more HCT from CIBA within a specified time period, Carter did not use the CIBA HCT for combination with meprobamate, even though Carter had no obligation to purchase from Merck. On February 14, 1964, Carter signed a letter agreement with Merck providing that Merck should continue to supply Carter's "domestic bulk hydrochlorothiazide requirements" (really only Carter's meprobamate combination requirements). Yet, less than a month later Carter wrote to CIBA requesting relief from its obligation to have completed a purchase of 1,200 Kg. of HCT by September 1965. Clearly, Carter must have believed that the HCT it purchased from CIBA could not be used in combination with anything other than mebutamate.

Carter also took steps to assure that the HCT it bought from CIBA would be kept separate from the HCT it bought from Merck, in order that the two sources of supply could be segregated into their respective combinations. These steps were "[i]n view of our contractual relations with both Ciba and Merck on the *use* of hydrochlorothiazide." (Emphasis supplied.)

Carter has sold substantial amounts of HCT purchased from CIBA, pursuant to its understanding, at all times in combination with mebutamate (Caplaril). From 1965 through 1969, Carter's sales of this product were about $551,000.

Carter was not told by CIBA and did not learn from any other source the terms or provisions of any of CIBA's existing or subsequent agreements with any other licensee or vendee.

### THE CIBA–LEMMON AGREEMENT

In the late summer of 1960, Paul Wilcox (then vice president and research director of Lemmon) learned that the sales of HCT were almost $40 million in 1959 and that CIBA was selling HCT in bulk to other companies. In September 1960, Wilcox suggested to John Lemmon (president of Lemmon) that Lemmon approach CIBA for a supply of HCT.

On September 23, 1960, Wilcox wrote to Custer (then director of chemical sales of CIBA) and requested that CIBA supply Lemmon with bulk HCT. Wilcox informed Custer that Lemmon marketed its products in such a way that competition between CIBA and Lemmon for HCT sales would be "practically non-existent." In response, Custer informed Wilcox that CIBA would not "license hydrochlorothiazide or sell it in bulk."

On June 28, 1961, John Lemmon contacted Sichel at CIBA to again request a supply of HCT. However, this time John Lemmon stated that his company did not intend to use the HCT "as a straight item but rather in combination with another ingredient or ingredients."[6] He also informed Sichel that Lemmon's sales of HCT would not compete with CIBA, since Lemmon's main business was done with dispensing physicians.

On July 6, 1961, CIBA's Management Committee met to review Lemmon's request, among others. The Committee decided: "After reviewing these applications, Mr. Sichel was authorized to notify Lemmon ... that we [Ciba] would be willing to sell them bulk hydrochlorothiazide for use *in combinations....*" (Emphasis supplied.)

---

6. It is fair to infer that when Wilcox approached CIBA the second time, he limited his request to combination products because he knew, from the previous experience, that CIBA would not supply HCT for sale in straight formulation. The proofs show that Lemmon was always interested in a straight formulation of HCT and that it asked CIBA to supply HCT for that purpose as late as 1967.

On July 24, 1961, Sichel sent Lemmon the Sichel form letter announcing CIBA's policy with regard to the sale of bulk HCT.

On August 15, 1961, John Lemmon and Wilcox (for Lemmon) and Sichel and Hackl (for CIBA) met to discuss Lemmon's interest in purchasing HCT. At this meeting, Sichel once again informed Lemmon of CIBA's bulk HCT sales policy. In response, John Lemmon stated that Lemmon's primary interest in HCT was for (1) a combination for cardiovascular application containing mannitol hexanitrate, reserpine, and perhaps rutin; (2) an asthma combination containing aminophylline, a barbiturate, and ephedrine; and (3) a premenstrual tension product containing APC.

On August 17, 1961, Hackl wrote Sichel and recommended that CIBA allow Lemmon to combine HCT (1) with mannitol hexanitrate and (2) with aminophylline. The first combination was similar to Warner's HCT combination product, but at this point Warner had been unsuccessful in marketing its product. Furthermore, Lemmon would sell this first combination to dispensing physicians. Hackl recommended approving the second combination even though "the therapeutic rationale is somewhat questionable and may be very difficult to approve through the FDA." Hackl recommended that CIBA not approve Lemmon's use of HCT in combination with APC because this combination would have little therapeutic advantage over HCT in straight formulation (i. e., be equivalent to the sale of HCT in straight formulation). Hackl felt that if CIBA approved this combination, it would have to approve similar requests from other companies to which CIBA had sold HCT (and thus, in effect, violate CIBA's policy against the sale of bulk HCT for use in straight formulation).

CIBA's Management Committee then met and considered the three combinations requested by Lemmon. The Committee authorized the negotiation of an agreement with Lemmon under which Lemmon would purchase HCT from CIBA "for inclusion in combination products." The Committee also "approved" the sale of HCT to Lemmon for combination with (1) mannitol hexanitrate, and (2) aminophylline. The Committee denied Lemmon's request to use HCT in an APC combination.

On August 23, 1961, Lemmon was informed of CIBA's decision to sell HCT to Lemmon for combination with mannitol hexanitrate and with aminophylline. Lemmon was also informed that CIBA would not give its approval for a combination of HCT and APC.

APC is a non-prescription drug sold over the counter in drug stores as a headache remedy. It is not very therapeutically active, and an HCT–APC combination would have no significant therapeutic advantages over HCT in straight formulation.

On September 6, 1961, Lemmon requested that CIBA approve two additional combination products, one for obesity and one for premenstrual tension. CIBA's Management Committee then approved Lemmon's request, and Hackl informed Lemmon of this approval.

On September 25, 1961, Sichel sent an agreement to be executed by Lemmon. The agreement provided that, as agreed by CIBA and Lemmon at the August 15 meeting, CIBA would sell Lemmon bulk HCT "for use in specific combination products." Lemmon executed and returned the agreement to Sichel.

The CIBA-Lemmon agreement (dated October 1, 1961) provided that the HCT Lemmon purchased from CIBA was to be used "for the sole purpose of preparing and marketing a product or products which make use of a combination of hydrochlorothiazide with another or other therapeutically active ingredients, after approval of each combination by Ciba. . . ." At this time CIBA had approved four HCT combination products for sale by Lemmon.

CIBA's Management Committee then met and approved the CIBA-Lemmon agreement.

## THE PARTIES' UNDERSTANDING OF THE AGREEMENT

At all times CIBA understood that its agreement with Lemmon prohibited Lem-

mon from reselling any HCT which CIBA sold to Lemmon in any form other than in a combination product for which CIBA first gave its approval, and, thus, Lemmon could not resell such HCT (1) in bulk form, (2) in straight formulation, and (3) in a combination product not first approved by CIBA.

At all times Lemmon understood that its agreement with CIBA prohibited Lemmon from reselling any HCT which CIBA sold to Lemmon in any form other than in a combination product for which CIBA first gave its approval, and, thus, Lemmon knew that it could not resell such HCT (1) in bulk form, (2) in straight formulation, and (3) in a combination product not first approved by CIBA.

## THE IMPLEMENTATION OF THE AGREEMENT

On December 27, 1961, Dr. John F. Herndon (director of research and development at Lemmon) wrote Hackl at CIBA to request CIBA's approval of four additional combination products containing HCT. Dr. Schlittler (then head of research at CIBA) considered the four HCT combination products requested by Lemmon and informed Sichel that they "were O.K., although Ciba would probably hesitate to bring such combinations to the market." CIBA's Management Committee, although it was advised of Dr. Schlittler's views, approved the four additional HCT combinations requested by Lemmon. Hackl then informed Lemmon of this approval.

On January 4, 1967, D. R. Stauffer (then technical director of Lemmon) wrote to Hackl seeking CIBA's approval for four additional HCT combination products. In addition, Stauffer inquired whether CIBA had changed its policy with regard to "the use of straight hydrochlorothiazide and/or hydrochlorothiazide in combination with reserpine by licensees."

On January 11, 1967, Smith, CIBA's manager of chemical sales, informed Stauffer that CIBA had approved three of the four requested combinations. The fourth, a combination of HCT and hydralazine hydrochloride, was not approved by CIBA. Smith also informed Stauffer that CIBA's "policy regarding the use of straight HCT and/or HCT in combination with only reserpine ha[d] not changed."

The reason why CIBA denied Lemmon the right to combine HCT with hydralazine hydrochloride was simply that CIBA had been issued a patent on that combination on November 29, 1966. Without a license from CIBA under this new patent, Lemmon's product would be infringing.

Lemmon never succeeded in marketing a combination of HCT and never purchased any significant amounts of HCT from CIBA.

The negotiations between CIBA and Lemmon were conducted solely between these two companies, and did not involve consultation or communication between CIBA and any other company, or between Lemmon and any other company.

There is no evidence that Lemmon was told by CIBA or learned from any other source the terms or provisions of any of CIBA's existing or subsequent agreements with any other licensee or vendee.

## THE CIBA–ROCHE AGREEMENT

In early 1959, Roche was impressed with the medical and commercial aspects of the rauwolfia antihypertensives and the sulfonamide diuretics. Roche initially decided to try to market a straight-form diuretic, but by October 1959 Roche concluded that from a commercial standpoint there would be too much competition from straight-form diuretics already on the market to warrant Roche's marketing a similar product.

By 1960 it was Roche's feeling that "[t]here is no longer an urgent need for a diuretic of the [HCT] series for marketing as a single specialty; however, a compound should be ready for marketing within 1 to 2 years in a combination product." Roche management also concluded that "[t]he search for a compound with distinct advantages over the currently marketed diuretics should continue as a long term project in each Roche research center."

Roche developed a new antihypertensive, coded Ro 5–3307, the clinical trials of which had, by early 1962, been promising. In addition to marketing that antihypertensive as a specialty, Roche concluded that a combination of it and a "benzothiadiazine diuretic" would be logical. In the spring of 1962, Alfred F. Zobel (then director of product planning at Roche) contacted Hackl of CIBA concerning a license for HCT. Hackl informed Zobel that CIBA would be willing to sell HCT to Roche on certain conditions.[7] These conditions were the familiar ones about the purchase of CIBA's NDA and the timing of the sales, etc.

On March 8, 1962, at a meeting of Roche's Research Steering Committee, it was decided that Roche would not make further contact with CIBA until Roche filed an NDA on the combination. Consequently, Roche did not, at this time, enter into a supply agreement with CIBA. Roche did, however, purchase small quantities of HCT from CIBA for use in its continuing experimental work.

By 1964, after further investigation, Roche decided to proceed with the marketing of the combination of Ro 5–3307 (now known as Declinax) and HCT. In October 1964, Carl DePrima, Roche's director of purchasing, contacted CIBA with regard to the purchase of bulk HCT. On October 30, 1964, Andrew Smith, the director of chemical sales of CIBA, sent DePrima the Sichel form letter, supra, at 17–18. On February 11, 1965, DePrima phoned Smith and informed him that Roche and CIBA had previously discussed the proposed sale of HCT to Roche and that Roche was not prepared to conclude the negotiations. DePrima sent to Smith copies of the earlier correspondence.

As a memo from Silloway, the president of CIBA, to Von Werdt, an attorney for CIBA in Switzerland, later showed, CIBA was not anxious to enter into an agreement with Roche. As this memo said: "[w]hile we were not happy about having additional licensees at this point, it appeared that we had made proposals to Roche which could not, in good faith, be withdrawn."

On March 3, 1965, Gerhard Zbinden, Roche's vice president of research, wrote to Smith again stating Roche's interest in a supply of HCT. On March 22, 1965, after obtaining Haines' approval of a draft agreement for Roche, Smith forwarded two copies of the agreement to Zbinden at Roche. Smith also informed Zbinden that: "[i]t will be necessary to attach the Annex A sheet . . . to supply CIBA with a description of the combination or combinations to be used with HCT."

On April 21, 1965, Zbinden sent a revised version of the proposed agreement to Smith. The changes embodied therein were accepted by CIBA.

The executed agreement between CIBA and Roche (dated April 28, 1965) contained four "whereas clauses," six substantive provisions, and an appendix. The first operative provision obligated CIBA to sell and Roche to buy its requirements of HCT during the lifetime of the HCT patent. Roche was obligated to purchase at least 1,000 kgs. of HCT at $85 per kg. in the three year period following approval by the *FDA* of an NDA covering any combination product listed in Appendix A. The second operative provision obligated CIBA to supply all of Roche's needs for HCT prior to the *FDA's* approval of any combination product. Therefore, CIBA was obligated to supply all of Roche's needs, but Roche was only obligated to purchase if the *FDA* approved an NDA on the combination. Appendix A, which was filled in by Roche pursuant to Smith's directive of March 22, 1965, recited

---

7. In a memo he wrote to Sichel reporting his conversation with Zobel, Hackl said, "I agreed to submit a contract to them similar to our arrangements with SKF and Carter except for the purchase of the NDA." A review of the memoranda retrieved from Roche's files leads to the conclusion that this reference to CIBA's agreements with other companies was not made to Zobel. As was true on other occasions, CIBA management, internally, used a shorthand method of referring to the different sorts of agreements outstanding as "Abbott" or "Warner" or "RMI" agreements. There is no reason to suppose that CIBA discussed the terms of its other agreements with anyone at Roche.

that CIBA had approved the combination of HCT and Declinax.

The third "whereas" clause recited:

WHEREAS, ROCHE ... wishes to purchase from CIBA quantities of Hydrochlorothiazide for the sole purpose of preparing and marketing a product or products which make use of a combination of Hydrochlorothiazide with another or other therapeutically active ingredients, after approval of each combination product by CIBA. . . .

The purpose of this recital and the thrust of the agreement was to limit CIBA's supply obligation to Roche's requirements for approved products. The evidence establishes that Roche was not interested in marketing a straight formulation HCT product. And the evidence shows that Roche was generally not in the business of purchasing another company's product in bulk for resale in bulk.[8] The evidence also establishes that Roche never seriously considered any combinations with HCT other than that with Declinax.

Pursuant to the terms of the second operative provision, Roche purchased 10 grams of HCT in 1965, 20 kgs. in 1966, and 49 kgs. in 1967. Roche has not purchased HCT since 1967. Roche never obtained an NDA on a combination of HCT and Declinax and has made no purchases pursuant to the first operative provision in the agreement.

## THE PARTIES' UNDERSTANDING OF THE AGREEMENT

As was true with the other agreements, CIBA understood that any HCT sold under this agreement to Roche was for use only in combination with Declinax, the approved product. CIBA understood that the vended HCT was not for formulation into a single entity drug, and that it was not for resale to any other firm in bulk.

There is no evidence to suggest that Roche believed that it was contractually prevented from using the purchased HCT as it saw fit. The language of the agreement, however, leads the court to conclude that Roche understood that CIBA would supply Roche's requirements for HCT only insofar as Roche required the HCT for combination with Declinax, or with some other active ingredient approved by CIBA.

The negotiations between CIBA and Roche were conducted solely between these two companies, and did not involve consultation or communication by CIBA with any other company, or consultation or communication by Roche with any other company.

There is no evidence that Roche was told by CIBA, or learned from any other source, the terms or provisions of CIBA's existing or subsequent agreements with any other licensee or vendee.

## CIBA–LILLY LICENSE AGREEMENT

CIBA licensed Lilly to make and use cyclothiazide, but to sell it "in speciality form" and not in bulk form. This agreement contains language that is identical to that challenged by the government as unlawful in the CIBA-Abbott HCT license.

## GENERAL FINDINGS AS TO THE SALES AGREEMENTS

None of CIBA's HCT vendees or putative vendees, as a matter of the independently determined marketing policy of each, purchased drugs in bulk for resale in bulk.

None of CIBA's vendees or putative vendees considered, prior to executing the agreement, that it wanted to resell in bulk form HCT which it would purchase from CIBA.[9]

Two of CIBA's vendees (Warner and Roche) had initially considered the idea of marketing HCT in straight formulation.

8. Roche's Chemical Division manufactured and sold a limited number of drugs in bulk form (about ten vitamins, a cough remedy, an antihistamine, a sulfa drug, and various veterinary and sulfa products). Aside from three vitamin products which Roche purchased in bulk and resold in order to be able to offer its customers a complete line of vitamins, Roche did not purchase drugs in bulk form for resale to other pharmaceutical companies.

9. See the discussion of Warner's excess supply problem, supra at 1131.

Both, however, independently rejected the idea because of existing market competition in straight form HCT.

Only Lemmon desired to manufacture straight form HCT and continued to want to do so even after it executed its agreement with CIBA. Due to the restrictions which CIBA put upon Lemmon's use of HCT, it was unable to market such a straight form of HCT. Lemmon is presently marketing a straight formulation of HCT.

Five of CIBA's vendees never considered selling in straight form for human use (Searle, SKF, Carter, RMI and McNeil).

RMI did wish to market a straight formulation of HCT for veterinary use. RMI and CIBA both understood that CIBA would not supply HCT for that use under the existing contract. That is, both parties shared the understanding that RMI was not to market the HCT it bought from CIBA in a straight formulation. When RMI approached CIBA for CIBA's approval of this new product, CIBA refused to give it.

In contrast is the case of SKF marketing a *combination* product for veterinary use. CIBA did supply HCT for that purpose without any objection.

CIBA made it known to its prospective vendees that it would not supply HCT for combination with reserpine or other rauwolfia derivatives. CIBA further protected its own position by refusing to approve combinations that were virtually equivalent to HCT in straight form—for instance a combination of HCT and APC. CIBA also refused to approve a combination of HCT and hydralazine hydrochloride, which had gone off patent in 1966 because CIBA had itself filed a patent application on the combination.

In sum, the evidence bears out the accuracy of the "Sichel policy memorandum." [10] This memo, prepared in December 1961, postdated all of the vending agreements with the exception of the Roche agreement. The memo shows that CIBA's object in entering into these agreements was to "supplement sales of the finished package forms by *selling in bulk or granting licenses on specific products* where in the opinion of the Marketing Committee, such sales or licensing did not adversely affect sales of the same product in specialty form." (Emphasis supplied.)

## GENERAL FINDINGS REGARDING THE TURNDOWN EVIDENCE

Other than the 11 licensees and vendees described in prior findings, 84 companies, at one or more times, during the period 1959 through 1974 requested from CIBA an HCT license or supply agreement.

Of these 84 companies, CIBA offered to supply 10 companies with HCT, but, for one reason or another, these companies did not purchase the material in commercial quantities nor market an HCT product. The terms offered by CIBA generally followed the pattern of: combination product only, 1,000 kilos minimum over a three year period at $85 per kilo, resale of the combination on a trade name basis only. What evidence there is shows that these companies were unwilling to agree to the 1,000 kilo minimum or were unable to get CIBA approval for a combination with enough attraction to warrant the venture.

As regards the companies to which CIBA never offered to sell HCT, CIBA told 22 of them that it would not license them or sell bulk. Very little reason was given for the turndowns.

Of the remaining 52 companies, there is no evidence in the record of any response by CIBA to seven companies.

Of the remaining 45, two were refused because CIBA then had supply problems.

Of the remaining 43 companies, the nature of the reply to one (Zemmer) is unclear (although an agreement was not executed). Another company (Cooper-Tinsley) was asked by CIBA to make an offer, but no such offer was ever received by CIBA.

Of the remaining 41 companies, 13 made their request for the first time after the

10. See page 1127 supra.

filing of the complaint in this case. At that time, CIBA took all requests under advisement and has made no decision up to the present.

Of the remaining 28 companies, 21 received the Sichel form letter set out above at 1127–1128 supra. This letter informed the reader that any sales of HCT by CIBA were only for the purpose of combining that HCT with a specialty product resulting from the original research of the purchasing pharmaceutical house. It also set out the minimum purchase requirements. In two of these 21 responses, CIBA also indicated that it was experiencing a shortage of supply.

The remaining seven companies made multiple requests for HCT during the period 1959 to 1974. CIBA sent the Sichel form letter to five of the seven on at least one occasion. One of the recipients of this letter was also informed of the tight supply situation then existing. Four of the seven were turned down by CIBA at least once. Six of the seven renewed their requests for HCT after the start of the litigation in this case. CIBA advised them that it would take their requests under consideration. No licenses or supply agreements have ever been offered to these companies.

Typically, these seven companies were initially interested in marketing straight form HCT. Typically, CIBA informed these companies, one way or another, that HCT was available only for combination with another product.

The overall impression created by the evidence of these turndowns leads to the conclusion that CIBA would deal with a firm only when that firm expressed its agreement to CIBA's basic restraint: that the HCT sold by it be used only in combination with another product which met with CIBA's approval. Implicit is an agreement that the vendee would not resell the HCT (1) in bulk form, (2) in straight formulation, or (3) in a combination other than that which CIBA approved.

## DISCUSSION

This case was tried on two distinct theories of illegality: (1) that each of the vend-

ing agreements and each of the licenses in and of themselves involved violations of *Sherman Act* § 1, and (2) that the "network" of restrictive vending and licensing agreements amounted to a combination or conspiracy to allocate markets in the sale of HCT products and to boycott price cutters. The two shall be treated separately.

■ In regard to the first theory of illegality, the government has clearly established the requisite "contract, combination or conspiracy" to satisfy the requirement of *Sherman Act* § 1. See, e. g., *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

The proof in this case has shown a series of supply agreements which limit, in varying degrees, the range of uses to which the purchaser was entitled to put the vended material. Although these contracts were reached in a vertical, supplier-purchaser, context, they, in fact, were designed to limit horizontal competition between CIBA and its vendees. Such agreements are more pernicious antitrust violations than simple vertical restraints, for, as a result of them, "cartel activity then co-exists with the attempt to vertically control the discretion of the independent businessman." *Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711, 718, n.2 (S.D.N.Y.), affirmed 417 F.2d 621 (2d Cir. 1969).

■ Where it is shown, as it is here, that a vertically imposed restraint is intended to suppress horizontal competition, the court will treat the agreement as the equivalent of a horizontal restraint of trade. *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1955); *Interphoto Corp. v. Minolta Corp.*, supra; *Hobart Bros. Co. v. Gilliand, Inc.*, 471 F.2d 894 (5th Cir.) cert. denied 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973).

In *McKesson & Robbins*, the defendant distributed its own brand of products directly to retailers through its wholesale division and indirectly through independent

wholesalers. Due to McKesson's operation on the same functional level as its independent wholesalers, it was unable to claim the protection of the *Miller-Tydings Act*[11] and the *McGuire Act*[12] and its retail price maintenance practices fell under the *Dr. Miles*[13] rule of per se illegality. Similarly, in *Hobart,* supra, the manufacturer both sold to distributors and distributed itself. Its imposition of territorial "primary responsibility" restraints was consequently found to be per se illegal. Id. at 900–901. *Interphoto Corp.,* supra, involved a marketing scheme which included elements of price-fixing, territorial restrictions and customer allocation. As in *Hobart,* supra, and *McKesson and Robbins,* supra, the manufacturer both sold to its distributors and distributed itself. The court found each of the restraints, by itself, in per se violation of the *Sherman Act* § 1, both as vertical and as horizontal combinations. Id. at 718–721. CIBA both sold HCT to a number of drug companies and competed with those companies in the formulation of the bulk chemical into ethical specialities. Thus, for CIBA to use the fulcrum of its monopoly supply position in an attempt to insulate itself from horizontal

competition (1) in the sale of straight formulation HCT, and (2) in the sales of certain combination products, involves a restraint of trade in per se violation of *Sherman Act* § 1.[14, 15]

## OVERALL CONSPIRACY

This conclusion does not, however, necessarily encompass a finding of an overall conspiracy or combination needed to support the second theory of illegality—that of allocating markets or effecting a group boycott of price-cutters. The government has not established its position that such an overall conspiracy or combination can be inferred from the evidence.

It is the government's primary contention that CIBA put together a combination or conspiracy suppressing or restraining competition. To support this argument, the government has relied upon *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966),

11. 15 U.S.C. § 1, as amended by 50 Stat. 693.

12. 15 U.S.C. § 45, as amended by 66 Stat. 632.

13. *Dr. Miles Medical Co. v. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

14. As noted, infra, CIBA's attempt to insulate itself from horizontal competition by use of illegal post-sale restraints did not appreciably enhance its market position. However, an anti-competitive effect of a per se violation of *Sherman* § 1 is not a prerequisite to the government's right to obtain a judgment to that effect. The category of per se violations of the antitrust laws "is made up of agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *White Motor Co. v. United States,* 372 U.S. 253, 262, 83 S.Ct. 696, 701, 9 L.Ed.2d 738 (1963) citing *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The situation is, of course, different in the context of a private antitrust suit for damages. *Venzie Corp. v. United States Mineral Prod. Co., Inc.,* 521 F.2d 1309, 1316 (3d Cir. 1975).

CIBA has offered no business justification for its post-sale restraints. See *Tripoli Co. v. Wella Corp.,* 425 F.2d 932 (3d Cir. 1970), cert. denied 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1971), and compare *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). In view of the intensive FDA regulation of the drug field, it is difficult to understand how such a defense legitimately could be offered.

15. A simpler, more direct disposition of this issue would be to say that CIBA's post-sale restraints run afoul of the per se rule enunciated in *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) since it is ancient history that a right to impose such restraints is not part of the patent grant. See *United States v. General Electric Co.,* 272 U.S. 476, 489, 47 S.Ct. 192, 71 L.Ed. 362 (1926) and cases therein cited. Such a broad reading of *Schwinn,* however, may be difficult to justify in this circuit. *Venzie Corp. v. United States Mineral Prod. Co., Inc.,* 521 F.2d 1309, 1316 (3d Cir. 1975); *Tripoli Co. v. Wella Corp.,* 425 F.2d 932 (3d Cir. 1970), cert. denied 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1971).

and *United States v. Masonite Corp.*, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942).

As the court held in *Parke, Davis & Co.*, supra, a manufacturer violates the *Sherman Act* and becomes the organizer of an unlawful combination or conspiracy when he achieves compliance with his marketing policy by inducing each customer to adhere or agree to adhere to the program and thereby avoid competition from other customers. "The product then comes packaged in a competition-free wrapping—a valuable feature in itself—by virtue of concerted action induced by the manufacturer." Id. 362 U.S. at 47, 80 S.Ct. at 513.

There exists, however, a distinction between a course of conduct undertaken to implement a unilaterally arrived-at marketing strategy and a combination or conspiracy undertaken to achieve some jointly sought-after goal. Even where one company has "put together" a series of similar agreements with other companies in the course of marketing its product, this similar conduct on the part of those other companies is not necessarily equivalent to an illegal combination or conspiracy. Parallel business activity does not itself constitute a violation of the *Sherman Act. Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954).

Some evidence in addition to the fact that the companies acted in a similar manner is ordinarily required to establish the existence of the combination or conspiracy. In *Parke, Davis & Co.*, supra, the defendant, while soliciting the cooperation of each company, informed that company that it was also soliciting the adherence of all the others. Id. 362 U.S. at 33–34, 80 S.Ct. at 509. In *Interstate Circuit*, supra, the defendant-exhibitor wrote a letter addressed jointly to the distributors proposing that each of them combine with the defendant in an illegal scheme. Id. 306 U.S. at 216, 59 S.Ct. at 469. In *General Motors*, supra, the dealers whose parallel conduct was at issue,

had actually banded together before any approach was made to General Motors. Id. 384 U.S. at 131, 86 S.Ct. at 1323. Finally, in *Masonite*, supra, the parties were fully aware that their participation in a conspiracy was being sought. The central conspirator went so far as to circulate copies of new agreements among existing parties to the conspiracy. Id. 316 U.S. at 269, 62 S.Ct. at 1073. In these cases, the courts were able to find, from all of the evidence, that "knowing that concerted action was contemplated and invited," the putative conspirators "gave their adherence to the scheme and participated in it." *Interstate Circuit*, supra, 306 U.S. at 226, 59 S.Ct. at 474.

In the instant case, the evidence does not support such a finding. The government has shown a series of agreements between CIBA and several other companies, and it has shown that, by and large, these agreements contained similarly restrictive provisions. However, the evidence is insufficient to support a finding of the knowing concertedness of action, the dedication to a common end, which is essential to an illegal combination or conspiracy. Some of the facts which lead to this conclusion are:

1. CIBA never approached any of the vendees to sell them HCT. They all approached CIBA at different times over a period of years.

2. CIBA did not reveal, during the negotiations with any one firm, the identity of its other vendees or the terms of its agreements with them.[16]

3. The internal memoranda of the vendees show that they were unaware of each other's status as vendees of CIBA.

4. There is no evidence that CIBA proposed a common scheme to allocate markets or boycott generic firms. There is no evidence that CIBA ever contemplated or invited participation in such an enterprise.

---

**16.** Warner was able to guess that Abbott had a licensing agreement with CIBA. See page 1130 supra.

5. CIBA never attempted to keep its vendees apprised of the terms of its dealings with new vendees, and there is no evidence that the vendees made inquiry into these dealings.

The agreements were imposed by CIBA in an effort to protect itself from competition from its vendees. That this was CIBA's objective must have been obvious to them. There has been no showing, however, that the vendees accepted CIBA's agreements on the thesis that others were bound by similar terms. Thus, there can be no overall conspiracy wherein the vendees engaged in concerted action to protect themselves from competition with each other. More is required to prove conspiracy than the parallel acceptance by the vendees of CIBA's unilaterally imposed restraints, *Theatre Enterprises v. Paramount*, supra, and nothing more than this legitimately can be inferred from the present proofs.

In sum, while the evidence leads to the conclusion that CIBA pursued its own restrictive marketing policies by imposing restraints upon the uses to which its vendees could put the HCT, there was no concert of activity among the parties to these agreements to accomplish a larger objective.

## CONCLUSIONS AS TO THE TURNDOWN EVIDENCE

*United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) established the principle that, absent a monopolistic purpose, a businessman is free unilaterally to select his customers. There are limitations placed upon this right. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), held that what appears to be a "unilateral" refusal will be treated as an antitrust violation where it is undertaken in furtherance of an unlawful combination or conspiracy. Absent proof of such a conspiracy, however, CIBA was free to refuse to sell HCT to any other company.

## THE ABBOTT LICENSE AGREEMENT

CIBA and Abbott entered into the challenged supply and license agreement on April 22, 1959. As was more fully set forth above, the terms of this manufacturing license limited Abbott to make, use and vend HCT in specialty form only. That is, Abbott could not sell bulk HCT without being subject to a claim for infringement. Subsequent to the institution of this suit, CIBA unilaterally enlarged this license to make it unlimited. Prior to that act, Abbott had never sold any infringing HCT.

It has been the government's position that this license agreement amounts to a per se violation of Section 1 of the *Sherman Act*. Alternatively, the government has argued that measuring the terms of this license under the rule of reason or the doctrine of ancillary restraints, the license is in violation of Section 1 of the *Sherman Act*. No doubt it is true that this agreement is infirm when measured by either of these latter standards. However, the application of these standards is unjustified in light of the existing legal precedents.

Any limitation contained in a patent license, by definition, results in a restraint of trade. The restraint inheres in the grant of the patent itself which by its terms conveys the power to exclude. Therefore, it seems fruitless to attempt to judge the legality of a particular limitation contained in a license in terms of the competition it prevents from coming into existence. Rather, the legality of a limitation or series of limitations can only be judged with reference to the scope of the monopoly created by the letters patent.

In the end, the government's objection to the Abbott license is that CIBA imposed the limitation in order to exclude price-cutters from HCT specialty sales. CIBA itself consistently declined to sell bulk HCT to the so-called "generic" houses. CIBA also knew that Merck was unlikely to make such sales. By imposing the post-sale restraints on its vendees, CIBA had a purpose to prevent any of its HCT from ending up in the hands of price-cutters. Finally, by denying Abbott the right to make bulk sales under the license, CIBA effectively shut off the last possible source of an HCT supply for price-cutters. It is the government's

contention that this intent to exclude makes the Abbott license illegitimate.

■ This argument fails to account for the existence of the patent monoply. The proper standard for assessing the legality of a patent license is the legitimate scope of the monopoly. As the Supreme Court has said: "[T]he patentee may grant a license 'upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure.'" *General Talking Pictures Co. v. Western Electric Co.*, 305 U.S. 124, 127, 59 S.Ct. 116, 117, 83 L.Ed. 81 (1938). This idea was restated two years later in a case much relied upon by the government. *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456, 60 S.Ct. 618, 625, 84 L.Ed. 852 (1940). Therein, the court described the licensing powers of a patentee in the following terms:

> He may grant licenses to make, use or vend, restricted in point of space of time, or with any other restriction upon the exercise of the granted privilege, save only that by attaching a condition to his license he may not enlarge his monopoly and thus acquire some other which the statute and the patent together did not give.

■ Of course, where a patentee exercises his patent in an effort to expand his monopoly beyond that reasonably implicit in the patent grant, he may collide with the antitrust laws. *Standard Sanitary Mfg. Co. v. U. S.*, 226 U.S. 20, 48, 33 S.Ct. 9, 14, 57 L.Ed. 107 (1912). Thus, the question arises whether the limitation to specialty form sales only contained in the Abbott license transcended the bounds of CIBA's patent on HCT.

The government has relied heavily upon *Hartford-Empire Co., et al v. United States*, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945), and *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940). The *Hartford-Empire* case involved a patent-pooling and cross-licensing scheme. "It is clear," said the court, "that, by cooperative arrangements and binding agreements, the appellant corporations, over a period of years, regulated and suppressed competition in the use of glass-making machinery and employed their joint patent position to allocate fields of manufacture and to maintain prices of unpatented glassware." Id. at 406–407, 65 S.Ct. at 384–385. In the instant case, there are no cross-licensing agreements among multiple patentees at issue. The only patent involved is CIBA's patent on HCT. There was no regimentation of the whole antihypertensive and diuretic market. All that has been shown here was an effort by CIBA to prevent its licensees from selling bulk. The evil in *Hartford-Empire* was that patentees, through combination, were able to exercise monopoly power greater than legitimate monopolies conferred by the patents. There has been no comparable augmentation of CIBA's patent monopoly over HCT. *Hartford-Empire* provides little guidance with respect to the conduct proven here.

Neither is the instant case analogous to that presented to the Supreme Court in *Ethyl*, supra. There, the licensing scheme was constructed primarily to insulate the licensees from each other's competition and to exclude price-cutters from the sale of high test gasoline. As the court was careful to point out:

> The licensing conditions are thus not used as a means of stimulating the commercial development and financial returns of the patented invention which is licensed, but for the commercial development of the business of the ... [licensees] ... and the exploitation of a second patent monopoly not embraced in the first. Id. at 459, 60 S.Ct. at 626.

It was in CIBA's interest as a seller of specialty form HCT products to deny price-cutters access to bulk HCT. To the extent that it succeeded in denying such access, CIBA has derived an increased benefit from the sales of these products. It may be true that the sought-after absence of competition from price-cutters benefitted CIBA's

vendees and licensees as well as CIBA itself. Nevertheless, the primary purpose for the imposition of these restraints was directly to benefit CIBA through the protection of its own specialty products. When this is true, the limitation must be lawful.

Nowhere in *Ethyl* or in any other case cited by the government has any court held illegal a limitation or restriction on a manufacturing licensee's right to vend. On the other hand, there are a number of cases cited by the defendant which have found a variety of limitations in licenses valid.[17] This is not a case of cross-patents or patent pools hiding an effort to regiment an industry. Here, there is only one patentee pursuing its own economic interest in exploiting its patent monopoly. CIBA has not enlarged the scope of its patent by its license to Abbott. Nor has it attempted to acquire some other monopoly which the patent law did not give it.

The government has tried to distinguish *General Talking Pictures*, supra, on the ground that that case found permissible only certain "field of use" restrictions which do not pertain to the case before the court. The government asserted that a "field of use" restriction "divides up the exploitation of the patent along the lines of separate technological fields." In *General Talking Pictures*, the distinct "fields of use" were (a) the home use field, and (2) the commercial use field. The patented technology, which related to the manufacture of amplifiers, was equally applicable to both uses. In this first field, the patentee licensed over 50 firms to manufacture and sell, however, in the second, it licensed only two firms, both its own subsidiaries. The result was that it reserved to itself the entire commercial field of exploitation. How this division between the commercial field and the home field differs in its competitive effect from CIBA's reservation of bulk sales to itself is entirely unclear.

The inescapable fact is that the license to Abbott opened up competition in an area in which CIBA had the legal right to shut off all competition. To say that CIBA "restrained competition" by not licensing Abbott in as unlimited a fashion as was possible is to impose a duty upon the patentee that simply is not justifiable. The restraint on competition inheres in the patent monopoly itself.

## THE LILLY LICENSE

CIBA and Lilly entered into a license agreement which is very similar to the Abbott license. The only difference is that Lilly was licensed to manufacture and sell cyclothiazide rather than HCT. The former chemical was covered by other claims in the CIBA patent.

The same legal analysis applies to this license as to the Abbott license. Consequently, this license agreement, like the Abbott license, was in all respects legal.

## THE MERCK LICENSE

As a matter of fact, this court has found[18] that the license from CIBA to Merck contained no unwritten understanding that Merck would not sell HCT in bulk except in the context of its "exchange only" policy. Therefore, the Merck license was entirely unlimited and royalty free. As such, there can be no question of its legality.

---

17. In holding that a *limited output license* was valid, the court in *United States v. E. I. duPont DeNemours & Co.*, 118 F.Supp. 41, 226 (D.Del. 1963), affirmed 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) said: "[the] owner of a valid product patent may by license restrict production of the licensee to a specified quantity, at a specified place." *Express quantity limitations* were upheld by this court in *Q-Tips, Inc. v. Johnson & Johnson*, 109 F.Supp. 657, 660–661 (D.N.J.1951), affirmed 206 F.2d 144 (3d Cir. 1953), cert. denied 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954). A *limitation to a particular form or design* out of a number of possible forms or designs to which the patent could have been applied has been found legal. *Bela Seating Co. v. Poloron Products, Inc.*, 438 F.2d 733, 739 (7th Cir. 1971).

18. See pp. 1126–1127 supra.

## THE DISPARITIES BETWEEN THE MERCK AND ABBOTT LICENSES

While the Merck license was unlimited and royalty free, the Abbott license was limited and royalty bearing. CIBA and Merck were the senior parties to the patent infringement. When they entered into their cross-licensing agreement, neither knew which of them was in fact going to establish priority between themselves, although there may have been some feeling that CIBA had the edge. Additionally, Merck held a patent on an intermediate necessary in the production of HCT. For these reasons, CIBA and Merck entered into the licensing negotiations in very even bargaining positions. The terms of the license reflect this equality.

These conditions did not exist between CIBA and Abbott. It was fairly conceded between these two that CIBA would be awarded the patent and Abbott's application would fail. Both parties bargained for the best deal they could get and the testimony shows that each was satisfied with the result.

Where there are rational bases upon which two different patent licenses contain different terms, there can be no invidious discrimination to offend the antitrust laws. *Bela Seating Co., Inc. v. Poloron Products, Inc.*, 438 F.2d 733, 738 (7th Cir. 1971). Here, there were completely adequate business reasons and rational bases for the discriminations between the terms of the Abbott and Merck licenses.

## RELIEF

It is the accepted first principle of equitable remedies in antitrust cases that "the end to be served is not the punishment of past transgressions, nor is it merely to end specific illegal practices. A public in-

terest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendant's illegal restraints." *International Salt Co. v. United States*, 332 U.S. 392, 401, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). Thus, even though the defendant may, at the time of the decree, be in full compliance with the antitrust laws, he may, by virtue of past transgressions, have gained a position in the market superior to that which he would have had but for those previous transgressions. Where this is so, it is the obligation of the court to fashion a scheme of mandatory relief intended to dislodge the violator from that advantage. Id. at 400, 68 S.Ct. at 17; *United States v. Glaxo Group, Ltd.*, 410 U.S. 52, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973); *Hartford Empire Co. v. United States*, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945).

It is apparent that CIBA's anti-bulk sale restrictions in its vending agreements did not have the effect of narrowing the bulk market for HCT. Given CIBA's right unilaterally to pick and choose its customers [19]—a right which CIBA exercised carefully to avoid impairing its position regarding this patented product—it is clear that bulk sales would not in any event have been made to the generic houses. CIBA excluded them from its bulk market and those to whom it sold in bulk were all producers of ethical pharmaceuticals and not drug brokers or wholesalers. These houses had no interest in buying and selling drugs in bulk. They bought HCT as a raw material to be incorporated into drugs of their own manufacture.

It is unlikely that CIBA's anti-straight formulation restriction prevented the marketing of another straight HCT product.[20]

---

**19.** *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

**20.** Lemmon was the only vendee interested in marketing HCT in straight formulation for human administration as it now does. Lemmon specializes in sales to dispensing physicians,

and, thus, had a unique marketing ability for identical products. Lemmon is one of the smaller houses, and the record contains no information on the size of the drug market involving dispensing physicians. It is obvious that this share of the market must be quite small in comparison to drug sales on prescription or other physician order.

Merck, ever since its introduction of Diuril, has been the leader in the antihypertensive field. With Merck, CIBA and Abbott all marketing HCT in straight formulation, it is doubtful if any of CIBA's vendees would have considered another entry into that crowded field to have sufficient profit potential. An example of the difficulties inherent in introducing an additional straight form HCT product is the small share of that market that Abbott's Oretic has been able to command.[21]

The major reason for the dismal prospect of a new trade name straight HCT product is that price competition is a less important factor in the marketing of ethical pharmaceuticals. The leaders of this industry compete primarily on research and development of new drugs, availability of their product and service to the prescribing physician. When the physician prescribes, he is casting his drug decision in terms of therapeutic efficiency and not in terms of price—if indeed he is aware of price variations among identical drugs. Perhaps a wide price variation resulting in patient complaints might influence the physician's choice, but a small price differential will not. The blunt fact is that patients do not "shop" for ethical pharmaceuticals. Thus, it is that a new identical drug entering the market is denied the competitive edge of introduction at a lower than market price.

With price competition minimized, a new drug has little ability to attract the physician's attention away from the identical drug or drugs he has been using. Merck

has retained the lion's share of the antihypertensive market simply because it got there first with Diuril and has become associated with effective antihypertensive therapy. With Diuril, physicians acquired the habit of prescribing Merck for antihypertension therapy and this habit continued when Merck followed CIBA's heels with its own introduction of HCT. Thus, unless a new drug can provide a greater measure of therapeutic efficacy, it has little chance of displacing those in existing use.

There is evidence to suggest that CIBA's approved-only combination restrictions did have some minimal effect upon the market. CIBA did turn down some proposed combinations and, with respect to others, its vendees never sought approval because of the certainty of a turndown. While it would seem that the present effect of these inhibitions must be negligible, the possibility that CIBA has obtained some lingering advantage in the marketing of combination products necessitates a review of the present conditions.[22]

The evidence in this case has demonstrated that there is no identifiable HCT market, either in the medical or commercial sense, isolated from the medical equivalence and competitive pressures of other products. Rather, it has shown that there is a market of those drugs used for diuretic therapy [23] and another market of those drugs used to treat hypertension.

From a medical point of view, the preferred initial medication for hypertension is

---

21. Less than 1% of the antihypertensive or diuresis market in 1974, and less than 1% of both markets combined.

22. It is clear that any fixed combination of HCT and another drug or drugs is also available in free combination. Fixed combination drugs exist primarily for patient convenience, since they permit a patient to obtain the required dosage by ingestion of one pill instead of two or more. This is particularly important in treating hypertension since most patients are asymptomatic and treatment is preventative rather than curative. However, it cannot be gainsaid that the ready availability of free combinations has drastically limited any market effect of CIBA's turndowns of vendee-proposed fixed combinations.

23. Inasmuch as CIBA has no combination products that compete in the diuresis market, there is no reason to inquire into the state of that market. CIBA cannot be thought to have any residual advantage in that market.

today a diuretic.[24] All of the diuretics [25] (except for ethycrinic acid) either alone, as supplemented by a form of potassium, or in a free or fixed combination with a potassium sparing diuretic [26] are indicated for use in hypertension as initial therapy. Until their removal from the market, the four fixed combinations of a thiazide diuretic and potassium [27] would also be used for such initial therapy. However, the use of a diuretic as initial therapy was not as clearly recognized in the late 1950s, and other antihypertensive therapeutic agents, such as reserpine or other rauwolfia products, were frequently used as initial therapy. Also a free or fixed combination of a diuretic with another antihypertensive drug, such as a rauwolfia derivative, is frequently employed. Thus, the physician has available to him for initial therapy in a hypertensive patient all of the diuretics (except ethycrinic acid), all of the diuretic combinations referred to above, and the diuretic-rauwolfia derivative combinations.

Where initial therapy is not successful in bringing about a satisfactory reduction in the patient's blood pressure, it is generally recognized as good medical practice either to change the medication or to supplement the medication with additional drugs. Drugs which might be used at this stage would include propranolol and hydralazine, either in a fixed combination where available or in a free combination. If the medication were still not sufficiently effective, methyldopa might be substituted or added to the medication to achieve the desired result.[28] Guanethedine is a very potent antihypertensive drug which lowers blood pressure in even the most severe cases where the patient has not responded adequately to other medication. Thus, the evidence in this case has demonstrated that the various forms of antihypertensive medication were and are, from a medical point of view, reasonably interchangeable with diuretics and/or rauwolfia derivatives being generally used as initial therapy, with the remaining drugs used as supplemental therapy.

That this interchangeability is translated into commercial competition was borne out by the testimony of the employees of CIBA, Merck, Searle and Lilly as to the products with which their HCT or cyclothiazide products compete. "The outer boundaries of a

24. The medical evidence described the process of titration. This is a procedure used by clinicians to find the most effective drug or combination of drugs for use on a particular hypertensive patient. Basically it involves using a single drug in various dosages in order to obtain optimum control of the disease. If a single drug does not achieve good clinical results, drugs in free combination are tried until the clinical attainment is satisfactory. An experienced clinician need not go through all the basic steps of titration, but may be able to begin at a higher dosage or with a free or fixed combination. If a fixed combination is marketed that suits the patient, that fixed combination may be prescribed in substitution for the free combination previously used.

25. Thiazide compounds: chlorothiazide, HCT, cyclothiazide, methylclothiazide, trichlormethiazide, flumethiazide, bendroflumethiazide, hydroflumethiazide, benzthiazide and polythiazide. One or more of these compounds are marketed by Abbott, Lakeside, Schering, Squibb, Bristol, Tutal, Robbins, Pfizer, Merck, CIBA and other companies.

Non-thiazide diuretics: chlorthalidone, quinethalizone, spironolactone, triamterene, furosemide and ethycrinic acid.

26. Spironolactone (a patented compound marketed by Searle) and triamterene (patented by SKF) are both potassium sparing diuretics. When used alone or in conjunction with other diuretics, such as thiazides, they reduce the potassium loss associated with those other diuretics.

27. CIBA, Merck, Squibb and Lilly each marketed a fixed combination of a thiazide and potassium. The purpose of these combinations was to compensate for the thiazide-induced potassium loss. These drugs were all removed from the market in 1969 and 1970 due to untoward side effects.

28. One of the reasons why so many HCT combination products have been marketed is that different patients react in their own idiosyncratic ways to different drugs or to different combinations of drugs. The mechanism by which HCT actually lowers blood pressure is only imperfectly understood. Its use alone or in combination is based largely upon empirical judgment.

product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." [29] Bearing this in mind, it is the court's conclusion that CIBA's HCT products compete in a market composed of all products indicated for the treatment of hypertension.

## ANTIHYPERTENSIVE MARKET

The following is a chart summary of the market evidence presented:

| Product | Maker | 1969 sales (millions) | 1969 % of mkt. | 1974 sales (millions) | 1974 % of mkt. |
|---|---|---|---|---|---|
| **Straight formulation thiazides.** | | | | | |
| **Esidrix | CIBA | 2.47 | 2 (18) | 5.10 | 2 (17) |
| *HydroDiuril | Merck | 6.00 | 4 ( 7) | 18.00 | 6 ( 4) |
| Diuril | Merck | 4.42 | 3 (12) | 9.90 | 3 ( 9) |
| *Oretic | Abbott | 0.10 | – – | 0.31 | 0.1 – |
| Enduron | Abbott | 1.60 | 1 – | – | – – |
| **Thiazide and rauwolfia derivative combinations.** | | | | | |
| Serpasil | CIBA | 4.53 | 3 (11) | 3.42 | 1 (19) |
| **Serpasil-Esidrix | CIBA | 1.64 | 1 – | 1.33 | 0.4 – |
| *Hydropres | Merck | 11.6 | 8 ( 4) | 13.70 | 4 ( 7) |
| Diupres | Merck | 8.05 | 5 ( 6) | 8.04 | 3 (13) |
| *Oreticyl | Abbott | – | – – | – | – – |
| **Ser-Ap-Es | CIBA | 14.74 | 10 ( 1) | 26.11 | 8 ( 3) |
| **Singoserp-Esidrix | CIBA | 0.73 | 0.5 – | 0.56 | 0.2 – |
| **Other CIBA products.** | | | | | |
| Apresoline | CIBA | 1.96 | 1 (19) | 7.08 | 2 (15) |
| **Apresoline-Esidrix | CIBA | 0.23 | 0.15 – | 0.86 | 0.3 – |
| Ismelin | CIBA | 4.65 | 3 ( 9) | 8.49 | 3 (12) |
| **Esimil | CIBA | 3.27 | 2 (14) | 6.21 | 2 (16) |
| Serpasil-Apresoline | CIBA | 10.9 | 0.7 – | 1.12 | 0.3 – |
| **Selected other products.** | | | | | |
| *Aldoril | Merck | 12.39 | 8 ( 3) | 30.16 | 10 ( 2) |
| Aldomet | Merck | 12.64 | 8 ( 2) | 59.63 | 19 ( 1) |
| **Aldactazide | Searle | 2.85 | 2 (17) | 16.40 | 5 ( 5) |
| Aldactone | Searle | 0.66 | – – | 3.00 | 1 (20) |
| **Dyazide | SKF | 1.87 | 1 (20) | 14.50 | 5 ( 6) |
| Enduronyl | Abbott | 3.14 | 2 (15) | 4.12 | 1 (18) |
| Salutensin | Bristol | 8.98 | 6 ( 5) | 12.13 | 4 ( 8) |
| Hygroton | U.S. Vit. | 2.95 | 2 (16) | 9.40 | 3 (10) |
| Regroton | U.S. Vit. | 4.56 | 3 (10) | 9.25 | 3 (11) |
| Rautrax-N | Squibb | 4.95 | 3 ( 8) | 1.93 | 0.6 – |
| Raudixin | Squibb | 4.24 | 3 (13) | – | – – |
| Rauzide | Squibb | – | – – | 7.25 | 2 (14) |

* Product containing HCT.

** Product containing HCT manufactured by CIBA.

Number in parentheses represents product's standing in market.

29. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962).

A study of this chart and other evidence introduced by the defendant reveals that in 1969 the top 10 products controlled 58% of the market. Of these products, two were produced by CIBA: Ser-Ap-Es, with 10%, and Ismelin (a non-HCT product), with 3%. The top 20 products in 1969 controlled 79% of the market. Of these, six were CIBA products: Serpasil (a non-HCT product), with 3%, Esimil, with 2%, Esidrix, with 2%, and Apresoline (a non-HCT product), with 1%, in addition to Ser-Ap-Es and Ismelin. In all, CIBA products had 21% out of this top 79%.

By 1974, the top 10 products had 67% of the market. CIBA had only one product, Ser-Ap-Es, among these 10. The share of Ser-Ap-Es had fallen from 10% to 8%. Five other CIBA products were among the top 20: Ismelin (a non-HCT product), with 3%, Apresoline (a non-HCT product), with 2%, Esimil and Esidrix, both with 2%, and Serpasil (a non-HCT product), with 1%. Out of a total of 87% controlled by the top 20 products in 1974, CIBA had 18%. Of this 18% only 12% was attributable to HCT products, and of that fully 8% was attributable to one product, Ser-Ap-Es.

Of CIBA's products in the top 20, in either 1969 or 1974, only two are combination products: Ser-Ap-Es and Esimil. Ser-Ap-Es is a combination of Serpasil, hydralazine hydrochloride and HCT. Esimil is a combination of HCT and guanethidine sulfate. Serpasil was a patented product of CIBA, but, due to its close relation to other unpatented rauwolfia derivatives, was made widely available by CIBA. Hydralazine hydrochloride and guanethidine sulfate were also patented CIBA products. Unlike Serpasil, however, they were not made available to others by CIBA. The patent on the former expired in 1966 and the patent on the latter is due to expire in 1977. Almost immediately after the expiration of the patent on hydralazine hydrochloride, CIBA was issued a patent on the Ser-Ap-Es combination. Thus, it is easily understood that at virtually all times no other manufacturer could have marketed a duplicate of either Ser-Ap-Es or Esimil without infringing one or more of CIBA's patents, even by using non-infringing HCT. This leads to the conclusion that the market share of these two combination products in 1974 was not attributable to CIBA's efforts, more than a decade earlier, to prevent its vendees from duplicating certain of CIBA's other combination products.

The other CIBA HCT combinations [30] had a combined market share in 1974 of less than 1%. Consequently, it is impossible to conclude that they have so "wedged" themselves into the market [31] as a result of CIBA's illegal practices as to require any form of mandatory relief.[32]

For the foregoing reasons, it is the conclusion of this court that CIBA's illegal practices have left no lingering effects in the market. Despite the fact that certain of CIBA's vendees were discouraged from marketing combination products of their choice, CIBA as a result obtained no significant market advantage. Additionally, as the court concluded earlier, the anti-bulk sale and anti-straight formulation restrictions had no appreciable effect upon the market in the first place.

CIBA now is, and has been since May 29, 1973, in compliance with *Sherman* § 1. On

30. Serpasil-Esidrix, Apresoline-Esidrix and Singoserp-Esidrix.

31. *International Salt Co. v. United States*, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947).

32. To be emphasized is the competition HCT, alone or in combination, stands from Diuril (chlorothiazide). The only difference between HCT and Diuril is in dosage effectiveness. Per dosage unit, HCT is 10 times as effective as Diuril. Thus, 50 mg. of HCT will have the same therapeutic result as 500 mg. of Diuril. It is, therefore, most pertinent to point out, as shown in the chart above, that in 1974 Merck's Diuril had a larger share of the antihypertensive market than did CIBA's straight form HCT product, Esidrix.

that date, it, by letter, relieved its vendees from any existing post-sale restraints and also released Abbott and Lilly from the anti-bulk sale restrictions contained in the licenses to manufacture HCT and cyclothiazide respectively. There is no evidence which will lead to the conclusion that CIBA in the future will employ illegal post-sale restraints in connection with vended products. For nearly three years, CIBA has expressly eschewed that position.

Although this court's power to grant injunctive relief survives discontinuance of the illegal activity, the government must satisfy the court that such relief is required to prevent future violations. "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United ed States v. W. T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Since CIBA is now in conformity and since there is no reasonable likelihood that it will in the future engage in the imposition of illegal post-sale restraints, no prohibitory relief need be afforded.

CIBA has never conceded that its vending agreements violated *Sherman* § 1, but vehemently defended their legality here. Under this circumstance, the government is, of course, entitled to a declaratory judgment that CIBA has violated *Sherman Act* § 1 in the particulars set forth in this opinion. The attorneys for the government shall present a judgment, consented to as to form, if possible, within 10 days.